## RUSSELL *v.* DYER.

This court have the authority, after an opinion is delivered, upon motion, to grant a rehearing and re-argument of the case, and would do so upon good cause shown; but when the court, upon consultation, regard the decision made as expressing the deliberate and well considered judgment of the court, the motion will be denied.

The grounds of the former opinion in this case (as reported 40 N. H. 173), reëxamined, and the doctrines of that case re-affirmed.

THIS was a motion for a re-hearing of this cause after the opinion of the court had been delivered. The facts appear in the opinion.

*Perley, F. O. J. Smith,* of Maine, and *Benton & Ray,* for the defendant.

*Woods & Binghams, Flint & Bryant, Burns & Fletcher,* and *Lyford,* for the plaintiff.

SARGENT, J. This case was argued at the July term, 1859. All the judges of the court, as then constituted, were present, but two of them did not sit in the hearing. The case was continued, and before the December term three of the judges had resigned, and four others were appointed, the number having been increased to six. At the December term only one of the former judges was present, the other being absent and having been of counsel. The four judges newly appointed were present, but one of them having been of counsel did not act. Since that time one resignation has occurred, but the judge appointed to fill the vacancy has also been counsel.

The same judges, only, who made the decisions, are now qualified to act in the case. None of those who heard the argument are responsible for the opinion delivered, except the judge who delivered it.

The case is regarded as an important one, and the application for a re-hearing is unobjectionable. The court entertain no doubt of their power and duty to reëxamine their opinions, when a proper case is presented, and they think no pride of opinion should prevent them from re-considering an opinion, where they suppose they have fallen into error.

The court habitually rely much on the aid of the bar, and always regret to be obliged to decide without their assistance, but they are often compelled to depend upon their own investigations. The business of the court could not otherwise be done with the promptness which is required.

Where changes occur in the members of the court, they may sometimes be forced to decide cases where some of the judges have not heard the arguments, as in this case, but rarely without the aid of the briefs of counsel, if any have been furnished.

The conclusion to which a judge arrives, without the aid of counsel, may well be less satisfactory to himself, and much less confidently entertained than if he had seen the views entertained by those whose position compels them to entertain an adverse opinion from his own. Yet such an opinion, deliberately formed and

maturely considered, may not unreasonably be so far satisfactory to himself that he finds, when the question comes to be considered and discussed by the court in their consultations, that his opinion coincides with that of his brethren, and none of them entertain any doubt of the correctness of the result, he may very confidently concur in a decision of the case in accordance with those views.   It is well understood by those who have paid any attention to the working of judicial tribunals, that decisions are rarely, if ever, made at the first term after an argument, if any of the judges entertain such doubts of the result that he desires farther time for con-. sideration.

As the court is always anxious to avail itself of the aid of the bar, no case has ever happened within the recollection of any of us, before the decision of the cause, that the slightest intimation of a wish on the part of counsel, that a case should be re-argued on account of a change in the court, has been disregarded.   Sometimes the court decline to hear counsel, where an argument would lead to a continuance, where the counsel have been palpably negligent in bringing on a hearing, but rarely, if ever, has the case occurred where a re-argument has been declined, even in cases where the court have had no doubt, if the counsel have not been in fault.

It was under these circumstances that the case of *Russell* v. *Fabyan & Dyer* came before the court for decision at the December term, 1859.   The case had been fully and ably argued at the July term previous, upon a great variety of points, and a very full brief had been printed and furnished to the judges.   Among a great many points, some of them by no means unimportant, one principal point stood out quite prominently, which went to the whole merits of the case; the question, what was a public place, within the meaning of the statute relating to the sale on execution of rights in equity or rights of redemption.   The decision of this question depended upon the exercise of good judgment upon a consideration of the state of the country and the purposes of the legislature.   It was a new question upon the construction of a statute upon which no light could be derived from Littleton or Coke, nor argument nor authority from the ancient and venerable storehouses of the common law.   Learning and research could afford little aid, and judges, old and new, must alike rely mainly upon their own judgment for its decision.

Three different views present themselves to the court.   It might be held that nothing could be regarded as a public place except certain places and buildings designed for public use, as houses of public worship, taverns, post-offices, and stores, which might be regarded as in law public, because of their public use.   Another view might regard any place open to public observation, and likely to attract public notice as public, so that every door on Washington street or Broadway would be a public place, and all of them equally entitled to be regarded as the most public places in the city where they are. Another view, which was adopted by the court, was, that public place is a relative term, applying to different objects and situations,

according to the condition and character of the town or place which formed the point of inquiry ; and in judging what was to be deemed a public place regard must be had to the question, whether such place is, from situation, circumstances and use, one of the places where the inhabitants and others most frequently met or resorted, or had occasion to be, so that a notice posted there would, for that reason, be likely to meet public view and attract observation. And the court, upon conference, may have been as competent to decide that question as they would become with the aid of a new argument. It may be observed, that, upon either of the last views, it is hardly possible to conceive any inhabited place which would not have more than one public place, and the levy in this case would fail to show a compliance with a material requirement of the statute.

The return of the officer that there was but one public place in Nash & Sawyer's Location, and none at all in Crawford's Purchase, on general principles could not be contradicted for the purpose of defeating the levy, so that the question, what were public places in either was of secondary importance. The levy then being made, and the sale notified, admittedly without any literal exact compliance with the requirements and terms of the statute, by which alone such sales are authorized, were consequently merely void, and the conveyance by the officer simply inoperative, unless the court should adopt the opinion contended for by the defendant, that where a statute like this, providing for the application of a debtor's estate, under process of law, to the payment of his debts, requires certain things to be done, some of which, as the property is situated, are physically impossible, the compliance with the other requisites is sufficient, and all that the law exacts; and that if none of these requisites can be complied with, then the levy will be equally effectual without them ; or that a substitution of some other notice which the officer deems equally effectual may answer as a substitute. As to this point the decision did not differ from the first draft of the opinion in any material respect. Various authorities relative to the general doctrine of the construction of statutes were cited, but none having any direct bearing upon the construction of the statutes in question ; and the general idea that courts will be governed by the spirit and meaning of the statute rather than its letter, whenever they can find indications of such meaning, is assuredly among the most elementary principles of the law, and one upon which no especial citation would be likely to be needed, or to afford much aid.

The case presented the alternative of holding that in a case where the statute required impossibilities, it should be held to require nothing, or merely some supposed substitute, or that the statute should be held not to apply, where its requirements were impracticable, and that any attempt to use it in such cases should be void. This was a question upon which, supposing the question to be new, the court must be left to decide upon its good sense. Little aid could be deduced from the analogies to be obtained in cases bearing, at most, a faint resemblance to the one in question.

One decision was cited, a case not reported, but which will fall in

one of the volumes between the 14th and the 19th of the New-Hampshire Reports, of which the court knew little except from the defendant's argument, but which has since been printed in pamphlet form, and copies have been furnished us;—*Wells* v. *Burbank*, Coös County, August term, 1845, in which it was said in the brief, that the statute requiring notice to be posted up in an uninhabited place is inoperative, and need not be complied with, because the statute can not be intended to require impossibilities. That decision, as briefly stated in the defendant's argument, was before the court, and we need not say it was very carefully considered and most deferentially weighed.

The court do not yield to any body in sincere respect for the decisions of the eminent judge by whom that decision was pronounced, and they habitually entertain the highest confidence in his legal opinions, of which no one can entertain a doubt, who examines the decisions of the court since his time, and observes how constantly they are the foundations upon which we build. But the cases were not the same. The law relating to sales of land for taxes was not necessarily the rule for levies on execution; and the court, not being bound by that case as an authority, decided upon the convictions of their own minds upon the case before them, and were of the opinion that in the case before them the requirements of the statute could not be dispensed with; that the door for frauds and abuse would be opened so wide, if a sale could be made of valuable property on execution without notice, that no such construction could be admitted in that case.

The court are unable to feel that in a case of this kind any argument would probably have changed the result, or that months of consideration could have led to a different conclusion. Constituted as their minds are they can not believe that a man's property and estate, in this case of large value, is to be taken from him by legal process, without a substantial compliance with the requirements of the statute.

We have looked over with interest the decision relied on with so much confidence. It is there said (page 23), "It is not necessary to settle at this time what may be a public place within the meaning of the statute. Practically it is generally supposed to mean a tavern, store, or other place where people are in the habit of resorting for the transaction of business; perhaps a meeting-house, open from week to week for public worship, may come within the description. How we might hold in this case, if there had been a dwelling-house within the township, but no place more public, we have no occasion to inquire. As there was no inhabitant, there could be no public place. *Lex non cogit ad impossibilia.* The result is, not that the tax could not be collected, because no advertisement could be posted in a public place in the township, but that it might be collected without such advertisement if the other notices required by the statute were duly given. The evidence on this point was, therefore, immaterial."

This is all that bears upon the subject. It does not seem to any of us to have such a bearing upon the question as to neutralize,

much less to outweigh, the doctrine of the same eminent judge in *Whittier* v. *Varney*, 10 N. H. 296, where he says, in speaking of levies, "From the general principle that *the return must show a strict compliance with all the requisitions of the statute*, and from these authorities in illustration of it, the return in this case seems to be defective." The execution was against two. The officer returned that two of the appraisers were chosen by him, "the debtor within named" being notified, &c. The objection was that it did not appear that Varney, the owner, was notified, and the chief justice says: "Upon the face of the return, it is at least uncertain whether Varney was the debtor who neglected, &c. If the officer was disposed to assist in a fraud, and have Varney's land set off without notice, he might have notified Wendell and made this return."

We think this case illustrates the stringency of the rule as well as the considerations on which it is founded. The cases cited from the Massachusetts and Maine Reports go quite as far to sustain the principle. *Williams* v. *Amory*, 14 Mass. 20; *Benson* v. *Smith*, 42 Maine 414. The same principle was held in *Olcott* v. *Robinson*, 20 Barb. 150, where it is said, "It is an old maxim of the law that every statute authority to divest the title of one without his consent, and transfer it to another, must be strictly pursued, or the title will not pass. *Grosvenor* v. *Little*, 7 Greenl. 376; *Mather* v. *Chapman*, 6 Conn. 54; *Mead* v. *Harvey*, 2 N. H. 498; *Libbey* v. *Copp*, 3 N. H. 46.

*Grosvenor* v. *Little* was a case where the statute required the officer to give notice of the sale of equities of redemption by notifications posted up in two or more public places in the town or plantation where the mortgaged estate was situated. "The sale," say the court, "operates a statute transfer of the interest, and it is essential to the title of the purchaser that the conditions of the statute should be complied with. A part of the mortgaged land was situated in the town of Poland. The officer posted up a notification in but one place in that town. The omission to do it in two places there, is fatal to the title of the purchaser. Nor is it in our opinion the less so, because the mortgage also embraced land lying in another town." That case differs from the present in the fact that there it was not pretended that there was not more than one public place in Poland.

The case of *Wells* v. *Burbank* furnishes a striking illustration of the general principle that where the property of one man is transferred to another, under statute proceedings, the requisites of the law must be strictly complied with. The tax there was nine cents too large, probably by the misplacing the figure 1 on the sum of 33.10; yet the defect was held fatal and incurable.

But it is said that it is the policy of our laws to make all a debtor's property liable for the payment of his debts, except certain specific exemptions, and that is undoubtedly true. The act of February 15, 1791, N. H. Laws (1815) 181, which provided that real estate might be set off on execution, was entitled "An act subjecting lands and tenements to the payment of debts." The statute of 1829 contained similar provisions, and had the same title. N. H.

Laws (1830) 102. But while that was the avowed object of that statute, the creditor who would make it available for his benefit, must, in every instance, show an exact compliance with the provisions of the statute, as to the mode of the set-off. No discretion was left to the creditor or officer, or to the court, as to the way in which the debtor's lands were to be subjected to the payment of his debts. The statute provisions must be explicitly followed.

So in 1822, N. H. Laws (1830) 105, an act was passed, making provision that all rights in equity of redeeming real estate hereafter mortgaged shall be liable to be attached on mesne process, and taken in execution on the judgment, for the payment of the just debts of the mortgagor or owner. But we find a course of proceeding prescribed, which must be followed, to make such equities available for the payment of debts. And no discretion is left with the officer, or any body else, to say whether any of these requirements can, in a given case, be dispensed with.

Where a statute makes any part of a man's property liable for the payment of his debts, it also provides a way in which it may be taken and sold, and unless all the provisions of the statute are followed, the benefits to be derived from the statute can not be gained. And if a statute of this kind fails to provide a way in which any right or property may be sold, then there is no provision for its sale at all.

This is upon the ground that these several kinds of rights and interests in real estate were not liable to be taken on execution for the owner's debts, prior to the passage of the several statutes authorizing their sale. But we are aware that a view quite different from that has been taken. In *Pritchard* v. *Brown*, 4 N. H. 397, it is said that, before the law of 1822, authorizing the sale of equities of redemption, and when the statute in terms only authorized the setting off on execution of the lands held in his own proper right in fee by the debtor, yet that all real estate of every description was and had long been subject to be taken by an execution to satisfy a debt. *Richardson*, C. J., says, " Thus estates for life, and remainders and reversions, and even the right in equity which a mortgagor has to redeem land mortgaged, have always been considered as liable to an extent upon execution to satisfy the debts of those to whom they belonged, and the statute of 1822 was understood to operate only to change the mode of applying the right of redemption to the satisfaction of the debt, from an extent to a sale upon the execution."

Taking this view of the matter it will not change the result. In this view the statute of 1822 was either cumulative, furnishing a new method of procedure without abolishing or repealing the old one, or else it was exclusive, and where it provided a new method, repealed the old one. If the former should be held to be the true construction, then, when the creditor could not avail himself of the new method, he should have resorted to the old, and instead of attempting a sale of the equity, he should have made an extent upon it on his execution, and had the right set off to him in that way, which he has not done or attempted to do. But if the object

of that statute was "to change the mode of applying the right," &c., to provide a new mode which should supersede the old one altogether, which must probably be the correct construction of the law, then the party is limited to that mode alone, and must strictly comply with all its provisions, in order to hold the interest in the land. It would stand like a new provision where none had existed before.

We have thus considered the question raised by this application, with a view distinctly to affirm the authority of the court to allow a new hearing upon a suggestion of mistake or error, and to evince our willingness to hear when there is a plausible suggestion that the court, from any inadvertence or oversight, may have made an erroneous decision. At the same time we feel it necessary to suggest that the number of cases where a suggestion of that kind could reasonably be made, must necessarily be small, and that when upon consultation the court regard the decision made, as they do in this case, as expressing the deliberate and carefully considered judgment of the court, they will not be likely to lend much countenance to applications of this sort.

The motion must be denied.