To render a legitimate and judicious decision in this proceeding is not free from difficulty. I am not insensible to the responsibility or unaware that the wisdom of my present *Page 162 
determination must undergo the uncertainties of future eventualities.
On August 24th, 1944, one Willard Parker Perry was adjudged to be an insane person and thereupon committed to the New Jersey State Hospital at Trenton, where he continues to be confined. A writ of habeas corpus has been allowed and testimony has been adduced relative to his existing mental state. R.S. 2:82-50 etseq.; N.J.S.A. 2:82-50 et seq. The statutory duty in such an inquisition is to "find and determine whether the person in whose behalf the writ was sued out, is sane or insane."
It is no less difficult to evolve a standard chart of behavior sufficient to justify the continued confinement of an alleged insane person than it is to precisely define insanity. Most of the attempts to define insanity are more sententious than definitive, sometimes leaving some shadowy margin between the perceptible boundaries of sanity and insanity.
Psychiatry lies within the field of the specialist. His opinions are influential and serviceable, but it does not follow that every type of psychosis has the legal implication of insanity under the statute applicable to the immediate inquiry.
Basically viewed, the power of the state to restrain insane persons and confine them in some asylum is an exercise of the police power deemed in its operation to be conducive to the public welfare. The motive supporting such legislation is the desire to protect the public or the person confined, or both. An unwarranted deprivation of personal liberty is more than unconscionable. The permanent incarceration of a sane person in such an environment without hope of release is probably little less punitive than a sentence of death.
Therefore, differently expressed, I suppose the purpose of this inquiry to be to ascertain whether or not the mental condition of the patient is at present such that a continuance of his confinement is reasonably necessary to attain the objects of the statute. For that practical purpose it is not obligatory to declare what constitutes insanity in general, but rather to inquire wherein consists the alleged insanity of this particular individual. *Page 163 
This person is forty-eight years of age. He has and still does exhibit noticeable idiosyncrasies. However, the insanity implied by the statute is not established by proof of mere eccentricities of mind and action manifested by occasional breaches of decorum. We observe amidst humanity an indescribable variety of whims, caprices, and eccentricities. Perry is undoubtedly emotional, and in matters in which he is naturally interested, he displays some inordinate vigor and acuteness. On the few occasions in the past when he is said to have resorted to violence, there were evidently some inducements, the elements of which have not been revealed with the attending circumstances, and so whether he then displayed an emotional instability due to a mental deficiency is indeterminate. He is loquacious, yet his conversation is in point and coherent. He had a propensity to ride in automobiles and somewhat habitually indulged in "hitch-hiking," which was probably in many instances importunate and exasperating to motorists. Incidentally, on one such occasion he stopped the clinical director of the State Hospital, who literally (not colloquially) "took him for a ride."
His aberrant deportment over a span of years has aroused several complaints, from most of which, I note, he has been discharged. His peculiar acts have doubtless caused the police some annoyance. From such circumstances usually sprout the idea and inclination to "put him away." His commitment resulted from the application of the Ewing Township chief of police. His freedom is sought to be obtained by his mother and sister.
Contemplating his own welfare, I learn that he is not receiving any therapeutic treatment at the institution. In actuality he is not a patient. He is a prisoner. He has been in custody and presumably under critical observation for more than a year, and yet only three incidents of his conduct are reported. It is said that he is frequently noisy and vociferates what he himself describes as a "hog-call." One wonders what emotional outlet a neurotic but sane person so situated would choose to pursue. Then, it is stated that he has complained of a distressing sensation in his bowels and entertains the notion that there is a tapeworm in his intestine. *Page 164 
If his diagnosis is unauthentic, I would hesitate to label such an error as an insane delusion. In psychiatry, I imagine it might be catalogued as a slight manifestation of pathopsychosis. Thirdly, he asserted that he had conceived a device that would be exceedingly useful to the government in war, yet he has persistently declined to divulge its nature or character. While seemingly incongruous, the falsity of his statement is not at present demonstrable. At the hearing he stated that he did not wish to reveal the nature of the contrivance until he had obtained the protection of a patent. A delusion, I conjecture, implies a false impression without any real or possible factual basis.
The advanced study of phychostatics probably envelops numberless persons who in some degree may be classified as psychopathic. In a proceeding such as this we can well accept the enlightenment of scientific knowledge, but we cannot ignore the intent and purpose of the statute. The intent of the lawmaker guides the construction of the statute which is to be administered.
Supposing the evidence to reveal that this man manifests an unusual personality, eccentricities, perversity of conduct, and when aggravated or excited shows characteristics of emotional instability in the respects mentioned, should I adjudge him to be insane within the meaning of this statute? Does the public welfare or his own require his continued imprisonment? If liberated, is he likely to appreciably menace the safety of himself or that of the person or property of others? In the present posture of the proofs, I am inclined to think not. He retains a perception of right and wrong. I cannot regard him as an irresponsible being. I am not informed of any deplorable prognostic symptoms. A glimpse of the future can only be caught with the light of the present. Certainly with the right of liberty involved, a reasonable doubt of his insanity should be resolved in his favor. It is my conscientious judgment that although the mind of this man may be in some respects deficient superficially, it is not so substantially impaired in intellectual power as to necessitate his confinement. I shall therefore order his release. *Page 165