170 So.2d 603 (1965)
Petition of Jeanette PICKLES to declare her daughter, Muriel Pickles, Incompetent.
No. F-437.
District Court of Appeal of Florida. First District.
January 12, 1965.
*604 S. Gunter Toney, Tallahassee, for appellant.
RAWLS, Judge.
Upon the petition of her mother, an examining committee composed of two medical doctors and a layman was convened on the 11th day of April, 1964 by the County Judge of Gadsden County, Florida, for the purpose of inquiring into the competency of Muriel Pickles. On April 14, 1964, this committee, after making an examination of the alleged incompetent, filed its report with the County Judge in which they determined that she was incompetent "by reason of mental incompetency, to-wit: mental disease; that same is acute; that she has no particular hallucinations; that she is of the age of 29 and her propensities were that she leaves home for several days at a time; and that she does not require mechanical restraint to prevent her from self-injury or violence to others." The county judge after considering this report and receiving extensive testimony adjudicated Muriel Pickles mentally incompetent but did not order commitment. She filed notice of appeal from said order on the same date.
The sole point presented by appellant on this appeal is that the evidence was insufficient to support the adjudication of incompetency.
Appellant's history, as developed by the testimony of her parents and the medical experts, discloses: Muriel Pickles, age 29, was one of 9 children of Joe and Jeanette Pickles of Havana, Florida. In high school she was a cheer leader, played basketball, and was elected homecoming queen. She went to Washington for two years where she worked for a congressman, for the un-American Activities Committee, and for the F.B.I. When she failed to write home for a three months' period, her family after several telephone calls located her in a home for pregnant girls. Her father sent her money for her medical expenses and for the trip home. During the next four years she and her baby  a boy, now 6 years old  lived at her parents' home in Havana, Florida. A part of that time she worked for the State Road Department where she got into trouble, apparently with the credit union. Rather than be fired or demoted she went to work for the Florida Legislature and later for a Tallahassee attorney. About that time she had several small checks [$2.00 to $5.00 to $10.00] bounce due to insufficient funds. She then moved to Naples where she worked for an insurance company. When caught embezzling funds ($960 to $1,960) from petty cash, she contended that her boss also took money from that source without signing slips. She was released in the care of her parents with the understanding her father would make restitution in monthly installments. She has earned as much as $345.00 per month when employed, but has been living at home, unemployed, for the last 4 months. She leaves home for several days at a time without informing her family of her plans. On occasions they have found her staying with a friend in Havana. Her mother cares for her small son during these absences. Muriel thinks her parents are always reminding her of her mistakes. Her parents, who have been told by several of Muriel's employers that she needs help, feel that they impose no restrictions on her, that any mention they *605 make of her past mistakes is in the nature of helping her so she will not repeat them in the future, and that she is irresponsible to the extent she absents herself from home leaving the care of her child to her mother. They feel that if she moves away from their home she will get into more trouble and the financial burden of her "mistakes" is more than they are able to afford. They want her to have medical treatment if she needs it.
The lay member of the examining committee testified that he talked to Muriel's father and mother at which time they "briefed me on the situation" and that Muriel when asked if she would have herself committed, replied, "No". Upon cross examination, he stated that he read the statement the doctors gave and according to his understanding of Muriel's behavior she was endangering her health and the child's in that she was neglecting the child. He felt that Muriel needs advice.
One of the medical doctors who has practiced for 50 years (specializing in obstetrics) testified that he had observed Muriel Pickles, that he was the family physician and that he had known her for a long time. In response to the court's question, "Is it your opinion she is in need of psychiatric help?" this doctor testified that her past history as related by her parents indicates that she needs psychiatric treatment. His only other testimony on direct examination was that he concurred in the other examining physician's tentative diagnosis. On cross examination, this doctor stated that Muriel came to his office voluntarily, that he talked to her parents procuring a history from them prior to her visit, and that he didn't ask Muriel any questions. In response to the question, "The report here shows the tentative diagnosis of schizophrenia. Would you define?" the doctor answered, "I think she needs psychiatric treatment." He further testified, "She was schizophrenic from history  the way she was doing," and the next answer to a question concerning mental diseases was, "I am not familiar with schizophrenia; not a psychiatrist." He then states that the symptoms displayed by a schizophrenic are, "They run away from home  different things." His basis for concurring in the other doctor's diagnosis of schizophrenia was from the family history related to him of her actions in leaving home. He further testified that Muriel was not in any way dangerous to herself or anyone else; that he did not classify her as being insane.
It is interesting to note that after the testimony was taken of those two members of the examining committee and of a doctor produced on behalf of Muriel, the judge advised Muriel's attorney that he was going to continue the hearing, he would be glad to discuss the matter, and in the event "nothing is worked out", he would like to have the other examining doctor's testimony. Muriel was left on her own as far as liberty was concerned until a final disposition was made of the matter.
On April 22, 1964, the hearing was reconvened to receive the testimony of the remaining member of the examining committee, a general practicing surgeon of 28 years. In his opinion the patient exhibited signs of schizophrenia though he could not classify the type because to do so is very difficult and requires a long period of observation. In answer to the court's question, "In your opinion, could she be benefited by treatment?" he answered that he thought so since this type of mental illness is very amenable to treatment. The crucial questions and answers on direct examination by the court to this doctor upon whose diagnosis appellant was adjudicated incompetent are as follows:
"Q From your examination and the conclusions that you have reached in this case, do you feel that counsel and advice from a general practitioner such as you and Dr. * * * would be sufficient without psychiatric treatment?
"A Sometimes it is, but the fallacy in that, the reason it fails, is that so often-times we don't have complete *606 co-operation from the patient. They might have appointments and not keep them; that's what I mean. The main thing I think in this, as in most all mental illnesses, is the desire to get well. If a person really desires to get well, they probably would keep appointments; if they don't, they would not keep appointments; that is, without institutional care.
"Q Doctor, is it or is it not true, that for different types of ailments, a person that specializes in that particular disease or illness is more beneficial?
"A Much more so, because they know where a psychiatrist or a psychologist, and/or psychiatrist would certainly be better able and more capable of getting into the basic problems of why patient was sick, mentally sick. I think they certainly are much more capable.
"Q From your examination and what you have observed as to the condition of this patient, do you feel that in your opinion, it would be to her best interests to commit her to the Florida State Hospital for treatment?
"A Yes, I do. I think that anybody with this type of mental illness would be much more benefited by institutional care than by care on the outside. It's what I was trying to stress a while ago, that the failing of keeping appointments, even if they attended a psychiatrist on the outside, they may keep some and break some appointments; the cost is prohibitive almost for private psychiatric care. It's bad it is, but it is.
"Q. You do feel that her condition is such that she should have psychiatric care?
"A I think she would be much benefited by it, yes.
"Q Anything you want to add to what you have stated and what your report shows?
"A Yes, I would. It is terribly difficult, and I'm sure the Judge realizes this, as everyone knows in this short period of time to make any specific diagnosis on mental illness or any other type of illness. It takes sometimes weeks of study and observation to make a final diagnosis, a correct diagnosis, especially on mental illnesses. The Judge is not a Legislator, but I hope that sometime we will have laws so that patients can be placed somewhere, where they can be observed every day for a period of weeks. I think they will sometime; that way we could reach a much more correct diagnosis; talking to a patient for 15 or 30 minutes even in your office or jail where so many times we have to examine them 
"Q Do you feel that this patient's condition is such that she should have daily observation?
"A I think so, yes. I think that she would be helped a great deal. That's one of the bad things about schizophrenia. It's a disease of young people. The average is about 25 at onset; I notice she is 29. That's the bad thing about it  most young people can be completely cured and rehabilitated, so they can lead a happy, useful life."
Upon cross examination the doctor testified that he had no special training in the field of psychiatry of psychology; that schizophrenia is commonly called split-personality; that Muriel was not paranoid and had no hallucinations; that he did not think she is a true psychotic; that she does not suffer from alcoholism or depression and *607 does not have any history of violence; and that he did not think there is any danger in her harming anyone else. Of significance are the following answers to questions on cross examination:
"Q Were you able to determine what the apparent cause of her condition was? This statute that I am going by here should be on the report, whether it's acute or whether it's chronic; it's cause.
"A Yes, I know that. I don't know the apparent cause. I don't think I answered it on that.
"Q Now, if you had a situation here, where the 29 year old girl, who had one or two children, who has lived away from home in Washington, D.C.; also in South Florida, and who got in trouble in South Florida, and her parents came to her rescue and helped make restitution on some embezzlements, and she felt she was under a threat of prosecution and for that reason moved back with her parents, her parents constantly brought up her past mistakes, would it be normal under those circumstances if a person wanted to get away from this type of parental domination?
"A I should think so.
"Q Now, I believe you have already answered the next question about whether or not there is any indication of hallucinations, and I believe you said there was none.
"A None.
"Q Can you tell us what her propensities are; what is she likely to do  is there danger to herself or other people?
"A I don't think as far as harming anyone else, I don't think there's any danger of that at all. Her propensities, as far as I understand, she might leave home for a longer period of time than just a day or two; she might go off and stay a month or a year.
"Q Would this be normal for a 29 year old grown person who wanted to get away from home? It wouldn't necessarily mean that there was 
"A No, it would not be abnormal  the unhappiness 
"Q If she wanted to get a job and move out on her own, would this be abnormal for a grown person?
"A It wouldn't be abnormal.
"Q If this patient was willing to go to Dr. * * * or yourself, a minister, or anyone who could give guidance and counseling, and we all could use that, and was willing and co-operative in making the appointments, keeping the appointments, provided there was financial means to obtain this counseling and guidance, do you feel like this would be a safe thing to do, as distinguished from committing her to the hospital?
"A I think it would be safe; I don't think she would get as good  I don't think she could be helped as much by counseling.
"Q The climate of feeling amongst her and her loved ones, and all parties concerned, if all the parties agreed to this, such as the parents, the patient, and it could be worked out and eliminate hard feelings and have this guidance counseling, someone such as an M.D. or a preacher or someone that's trained in guiding people in solving social problems; do you feel that this would be conducive to curing any difficulty she might *608 have, rather than the hospitalization?
"A I have had very good results from patients going to the Mental Hygiene Clinic in Tallahassee  I think much better than going to a physician, a private physician who is not a psychiatrist, or to a minister, because there they have psychologists and psychiatrists.
"Q Would it be fair to state that there is some doubt about the diagnosis of schizophrenia here and the type, and in view of the doubt and in view of the co-operation, and in view of the feelings of the parties here, that perhaps out-patient clinic care at Tallahassee might be the better answer here?
"A I don't think it would hurt to try it. If it doesn't work out, then I think that she should have institutional care.
"Q. If additional observation could be had though, by psychiatrist at Tallahassee, and the Judge could get a further and more detailed report 
"A Yes, in the Mental Hygiene Clinic; as I said, the purpose of it is to help those patients that do not require institutional treatment. I have had some patients helped a great deal; some they have not helped and later had to be hospitalized, but I think that if she and her parents have any wish of not wanting to go to the mental hospital, then I would recommend consultations with the Mental Hygiene Clinic."
The medical doctor produced on behalf of Muriel testified that he had practiced 2 1/2 years in the United States Army, 1 1/2 years at Florida State Hospital, and 16 years in Tallahassee, Florida; that he had an extensive interview with Muriel at which time she gave him her entire history telling a very straightforward story of sequence of events showing reason and logic; that she realized when she was getting into trouble; that he did not believe that the problems of getting into trouble per se indicate insanity; that he had gotten into trouble and didn't know anyone who hadn't gotten into trouble; that he did not believe that Muriel is psychotic; that any mental disease she suffered was in a minor degree; that the key to the whole mental problem is what is normal; that a savage would be considered normal in Africa; that in his opinion she was not insane in either a legal or medical sense; that she does need counseling and guidance and this could probably be handled best on an out-patient basis; and that she knew the consequences of her acts. At this point the court asked the following questions:
"Q Doctor, in view of these things that she has been involved in from time to time since she got out of school, and later trouble that she had down the state, and assuming that she did have trouble with the law, with reference to bad checks that she gave, do you still think that she is able to take care of herself and stay out of trouble, leading a normal life, in view of all those circumstances?
"A Judge, I cannot answer that question if she is capable of staying out of trouble.
"Q If she was confined to Florida State Hospital, they would want to know if she was capable of leading a normal life  she had been committed and they would know she was subject to be released  they would be concerned.
* * * * * *
"A A lot of people are concerned. It will keep her out of trouble for that period of time; whether she is capable of managing her own affairs  many people get into *609 trouble  they are not incompetent.
"Q In view of her case, do you feel that she is in need of psychiatric treatment?
"A She is in need of counseling
"Q That is the thing we are concerned about; whether she is in need of psychiatric treatment. You don't think she is in need of psychiatric treatment?
"A No  not by a person who limits himself to psychiatry only.
"Q What type of treatment do you feel she is in need of?
"A Counseling and guidance would be a help.
"Q What type of treatment?
"A Someone who understands a little more about human nature  somebody to talk to her.
"Q You are getting back to psychiatric treatment when you say the treatment she needs is somebody to talk to her  if you can limit that to doctors  is there any other type of treatment?
"A Yes, every doctor of gynecology, obstetrics  does some degree of it.
"Q Do you think that type of doctor could be of help to her?
"A Yes, I do.
"Q You have talked to her on two occasions?
"A Yes.
"Q In view of your observations, the conversations you had, you feel it would be a mistake to commit her?
"A Yes, I don't feel she fulfills legal requirements for commitment.
"Q The legal requirements  that is not up to you  what I want you to tell me is whether or not her condition is such as to require treatment. The legal requirement  I don't think that is the question. Whether she needs psychiatric help is what I am concerned about.
"A She needs it; but to say she needs it by a psychiatrist, that is not a necessity.
"Q If she can get it otherwise 
"A Judge, to be frank, I don't think she would be benefited by state institution. She does not get that individual care.
"Q Are you familiar with the treatment she would get if committed?
"A I spent a year and a half on the staff.
"THE COURT: Thank you very much doctor. Mr. Toney, I'm going to follow the findings and reports of the doctors and I'm going to adjudge her incompetent. I'm not going to commit her this time, if there is a possibility that she and her parents might work out something that would be more satisfactory to her and to them than going to Florida State Hospital. I understand they have been talking about it, but I don't think anything has been done except making conversation, so far. If they work out something so she can come on home and look after the child and get treatment outside of the Florida State Hospital, it's all right if they work that out, and that's entirely up to them."
In ancient times the law that governed mentally disabled persons took the form of taboos and tribal customs. Until the Golden Age of Greece the prevailing explanation for mental disabilities was that the afflicted person was possessed of demons, and the chief method of treatment was *610 exorcising the demon from such person. Hippocrates (460-370 B.C.), the father of medicine, and the Greek physicians and philosophers who followed him recognized mental disabilities as natural phenomena and attempted to classify them. Roman law held that mentally disabled persons were legally incapable of agreeing to marriage or entering into contracts, and that once a guardian was appointed, the ward lost all legal capacity. As English jurisprudence developed, the legal incapacity of mental incompetents was recognized. In the early 17th century, Lord Coke, in Beverly's case, expounded the law of insanity and listed four types of persons included in the generic term non compos mentis as:
1. The idiot or natural fool;
2. He who was of good and sound memory and by the visitation of God has lost it;
3. Lunatics, those who are sometimes lucid and sometimes non compos mentis;

4. Those who by their own acts deprive themselves of reason, as the drunkard.[1]
At early common law, the lord of the fee was endowed with the custody and care of insane persons and other incompetents. Subsequently, such power became vested in the king as parens patriae.[2] So, after the Revolution the power became vested in the states, or the people thereof, upon two grounds; first, the duty to protect the community from the acts of those who are not under the guidance of reason; and, secondly, the state's duty to protect them as a class incapable of protecting themselves.[3]
Florida initially provided for judicial commitment of insane persons in 1856. As early as 1906 competency proceedings were commenced by a petition, followed by an examination of the alleged incompetent by a court-appointed examining committee, and concluded by an adjudication. The General Statutes, 1906, provided:
§ 1200  "When it is supposed that a person, resident of this State, is insane, either non compos mentis or sufficiently devoid of reason to be incapable of self control a petition signed by five reputable citizens, * * * setting forth that he or she is to each of the petitioners personally known and that their knowledge of the mental condition of the subject is sufficient to justify the belief that he or she is insane, and asking that examination be instituted * * *."
§ 1203  `On receiving the report of the examining committee, the county judge * * * shall examine the same; and if satisfied therefrom that the person examined and reported is insane within the meaning of this act, he the said judge shall so adjudge * * * [and order commitment to the State Hospital]. Provided, When the proceedings reported by the said committee show the alleged insanity is chronic, or produced by epilepsy or senility and that the person does not require confinement or mechanical restraint to prevent self injury or violence to others, but that he or she is indigent, the county judge * * * shall adjudge and decree that the person is incurably insane * * * *611 [and order that such person be delivered to a responsible person for care and custody or to the county to receive the care and maintenance provided by law for paupers.]"
Florida Statutes 1945, provided:
§ 394.20  "Whenever any person within this state is believed to be incompetent by reason of sickness, drunkenness, excessive use of drugs, insanity, or other mental or physical condition, so that he is incapable of caring for himself or managing his property, or is likely to dissipate or lose his property or become the victim of designing persons, or inflict harm on himself or others, application by written petition, under oath, may be made to the county judge * * *."
§ 394.22(1)  "If the judge, from the report of the examining committee and from the evidence introduced at the hearing, finds that the person under investigation is incompetent, mentally or physically or both, he shall so adjudge, and his judgment shall set forth the nature and extent of the incompetency; but, if he finds that such person is not incompetent, he shall dismiss the cause and discharge said person."
§ 394.22(3)  "Whenever any person who had been adjudged mentally incompetent requires confinement or restraint to prevent self-injury or violence to others, the said judge shall direct that such person be forthwith delivered to the superintendent of the Florida state hospital * * *."
As to the beliefs necessary for the petition, Florida Statutes 1963, § 394.22(1), F.S.A. contains the identical language quoted above from § 394.20 of the 1945 statutes except it adds the words "mental illness" prior to the word "sickness." The 1945 wording of the section relating to the judgment was carried forward verbatum in the 1963 statutes and the commitment provisions are in substance the same. From 1906 to the present date the examining committee is required to be composed of one intelligent citizen and two practicing physicians. Also carried forward to the present date is the 1945 statutory presumption that one adjudged either physically or mentally incompetent is incapable, during the duration of such incompetency, of managing his own affairs or making any gift, contract or instrument in writing which is binding on him or his estate.
The word "insanity" is well known to be a legal and not a medical term. Though frequently used in the early laws governing incompetency proceedings, it was never defined for that purpose. In spite of the refinement in terminology appearing in the 1945 law wherein words such as "mental illness", "mental incompetency" and the like were substituted for "insanity", our courts have referred to persons adjudicated incompetent under Chapter 394 as being insane. It should be noted that a different procedure is provided by § 917.01 for adjudication of insanity of criminal defendants and that this statute has, since its enactment, used the word "insanity."
Prior to the 1945 revision of the incompetency proceeding law, early cases drew a distinction between adjudication of "insanity" (under the incompetency law) and "insanity" as a criminal defense. These cases refused to admit into evidence in a criminal case proof of an adjudication of mental incompetency for the purpose of showing that competency to commit the offense had been adjudicated. The reasoning *612 as stated by Chief Justice Whitfield in Johnson v. State[4] in 1909 was:
"The statute authorizing the examination of persons to be committed to the State Hospital for the Insane does not contemplate an inquiry into the responsibility of persons for crimes committed, and an adjudication of insanity preparatory to commitment to the hospital is not a proper matter for consideration in a trial for a crime. See Reyes v. State, 49 Fla. 17, 38 South. 257; Davis v. State, 44 Fla. 32, 32 South. 822."
But that case held that present sanity for the purpose of determining whether defendant was incapable of standing trial for the crime should be determined by the court in which the case was lodged should the issue be raised.
The Deeb cases[5] held that present insanity for the purpose of determining whether defendant was capable of standing trial was conclusively determined in statutory insanity proceedings under §§ 3654-3657, C.G.L. (now §§ 394.20 and 394.22). The first Deeb case distinguished between insanity as a defense to a crime and insanity with reference to ability to stand trial in the following manner:
"It is conceivable that a person may at the time of committing an act be conscious of its nature and character as a social offense, and yet if called upon to plead to the criminal accusation and rationally conduct a defense he might be utterly incapable by reason of progressing primary dementia to do so. He might mislead his counsel as to facts, misinform them as to his relations with other actors in the legal drama, and be utterly unreliable as a witness in his own behalf."
In Corbin v. State,[6] however, Mr. Justice Buford applied the rule in the Deeb cases to a defendant who was pleading insanity as a defense to the crime of grand larceny. The Corbin case (1937) was apparently the first Florida case to specifically state the now often-quoted rule that a person adjudged to be insane is presumed to remain in that condition until it is shown by a contrary finding or proof that at a particular time the party previously adjudged insane was in fact of sound mind. Framed in the terminology of the statutes existing at that time, the language of the rule, unlike the statute, has never been modernized. Recent criminal cases apply the rule as did the Deeb case in situations where the defendant was adjudicated incompetent under Chapter 394 and is therefore presumed to be incompetent to stand trial.[7]
Although the early Florida cases recognized that adjudication of insanity for hospital purposes was a condition distinguishable from insanity for criminal purposes, the recent cases have obliterated this distinction at least in so far as ability to stand trial is concerned. If for no other reason, the far reaching effects of those recent criminal decisions lead us to the conclusion that extreme care should be exercised in adjudicating one incompetent, particularly since the words "insanity", "incompetency" and "mental illness" have not yet been defined by Chapter 394.
The Draft Act for the Hospitalization of the Mentally Ill[8] was published in 1952 by the National Institute of Mental Health. Federal Security Agency, as a guide for states in revising their commitment statutes. This Act defines "mentally ill" as *613 "substantial impairment of mental health by psychiatric or other disease" which is broader language than the term "insane." The words "mentally ill" as used in the Act have been construed by text writers to include all persons who should receive medical or psychiatric treatment. The Draft Act authorizes, but does not create a right to, hospitalization for all persons mentally ill. Its objectives are:
"(a) To make hospitalization readily obtainable by those mentally ill persons who voluntarily seek it and create a psychological atmosphere in which such hospitalization will be sought.
"(b) To create procedures for the involuntary hospitalization of the mentally ill which will not be harmful to the mentally ill person; with special reference to the problems of serving personal notice on the individual who is mentally ill and requiring him to make a personal appearance during the involuntary hospitalization procedures.
"(c) To secure for the individual who is mentally ill maximum protection of his civil rights or liberties.
"(d) To secure by law, to the person who is mentally ill, directly or indirectly, some elements of proper medical care."
The proposed provisions contained in the Draft Act have been endorsed by members of the medical profession and the bar; however, our legislature has not seen fit to enact such a measure and even though we might consider the overall objectives of said Act  which would require the state to provide medical treatment for all persons suffering from mental illness  to be commendable, it is not a function of the court to usurp this clear legislative responsibility under the guise of interpreting the law.[9] In the absence of legislation similar to the Draft Act the determinative question is not whether the person is suffering from a mental illness, is in need of psychiatric treatment, is in need of counseling, is staying out of trouble, or is leading a normal life. The pertinent question presented to the judge in cases such as this is whether the alleged incompetent is suffering from a mental illness to such an extent that he is incapable of caring for himself, or managing his property or is likely to dissipate or lose his property or become the victim of designing persons. There is a glaring absence of such proof in this record.
That the trial judge applied erroneous principles of law in the instant cause is apparent from the questions propounded by him to the examining doctors. The sum and substance of his inquiry was: "Does Muriel need psychiatric treatment?" Such might well be the principal point of inquiry if the legislature of Florida sees fit to enact the principal provisions of the Draft Act. The examining doctors concluded that Muriel exhibited signs and symptoms of schizophrenia, but could not classify type for to do so would require a long period of time.[10]
*614 Maloy in his treatise entitled Nervous and Mental Diseases[11] quotes Obernoff as stating:
"`* * * As time went on everyone recognized that the borderline * * * between schizophrenia and the neuroses (nervous diseases) is a fine one, that probably everyone is a bit schizoid as well as neurotic, and that it is the degree of constancy that determines whether the patient becomes schizophrenic in the pathologic (pertaining to disease) sense. The normal person has transitory schizoid episodes. The deduction from the above is, first, that in borderline cases  in cases in which there is not yet a preponderance of universally accepted symptoms of dementia praecox, there is often present a possibility of error in diagnosis; second, that much is yet to be learned about the disease; and third, that many persons apparently normal sitting in judgment in a case of insanity may not be entirely sound in mind themselves."
Thus, it is apparent that a diagnosis of schizophrenia standing by itself (which is not classified as to type) is insufficient to support an adjudication of incompetency within the purview of Florida Statutes 394.22, F.S.A. Weighing the evidence presented to the trial judge in light of the foregoing principles of law, we are compelled to conclude that he applied erroneous legal concepts in deciding that Muriel Pickles was incompetent as contemplated by Florida Statutes 394.22, F.S.A.
No question of bad motive on anyone's part is demonstrated in this proceeding. The concern of the trial judge and the examining committee has obviously been directed toward assisting Appellant. It is apparent that Appellant's parents have "walked the long mile" in trying to aid her when she has gotten into trouble. She admits to having passed worthless checks and embezzling funds which resulted in her seeking assistance from her parents. It is likewise apparent that Appellant has violated the mores of conduct regarded as normal by the present day standards of society. We do not condone these derelictions on Appellant's part; however, the proofs submitted herein do not constitute sufficient grounds for adjudicating a person to be incompetent. As stated by the doctor who testified in behalf of Appellant, "Many people get into trouble  they are not incompetent."
A person under restraint of his liberty is entitled to liberation where reasonable doubt exists as to his mental condition. An adjudication of incompetency is a partial deprivation of it.[12] The contents of this record fail to support the adjudication of incompetence, so the cause is reversed with directions to dismiss the petition.
Reversed.
STURGIS, Chief Judge and WIGGINTON, J., concur.
NOTES
[1] Lindman And McIntyre, The Mentally Disabled And The Law, Pages 6-8 (1961).
[2] 17 Fla.Jur., Insane, etc., Persons, § 3.
[3] State ex rel. Deeb v. Fabisinski, 111 Fla. 454, 152 So. 207, 211, 156 So. 261 (1933).
[4] Johnson v. State, 57 Fla. 18, 49 So. 40 (1909).
[5] Deeb v. State, 118 Fla. 88, 158 So. 880 (1935), and State ex rel. Deeb v. Campbell, 123 Fla. 894, 167 So. 805 (1936).
[6] Corbin v. State, 129 Fla. 421, 176 So. 435 (1937).
[7] See Horace v. Culver, 111 So.2d 670 (Fla. 1959).
[8] The George Washington Law Review, Vol. 19 (1950-51) pp. 512-516.
[9] "Mental patients now occupy one half of the hospital beds in the country. One out of every 18 persons in the United States is suffering from some form of mental illness, and it is estimated that one out of every ten persons will need psychiatric care at some time in his life. See Parren, One Out of Ten, This Week, Nov. 7, 1946, p. 5; Statistics Pertinent to Psychiatry in the United States, Report No. 7, G.A.P., March, 1949; Bowman, Presidential Address, 103 Am.J. Psychiatry 1 (1946); Barton, Hospital Services for the Mentally Ill, 286 Annals 107 (1953)." 31 North Carolina Law Review, Hospitalization of the Mentally Ill, 1952-53, p. 274, Footnote 2.
[10] One doctor testified that the three types of schizophrenia are simple; hebrephrenic and paranoid. That simple is a disparity between emotions and ideas and reality; in the hebrephrenic they are usually more withdrawn from society and will often not move for long periods of time; paranoid which involves hallucinations could be eliminated; and that Muriel was probably borderline between simple and hebrephrenic.
[11] Maloy, Nervous and Mental Disease, 1935, p. 395, quoting from Obernoff, Arch. of Neur. & Psych., March 1930, p. 597.
[12] Schutte v. Schutte, 86 W. Va. 701, 104 S.E. 108, 19 A.L.R. 711 (1920).