Probate Court, Merrimack County
Nos. 7737 & 7738

RANDOLPH H. PROCTOR

v.

EDWARD JOSHUA BUTLER

ROLAND LORD

v.

LOUIS F. ZUCCARO

November 16, 1977

*New Hampshire Legal Assistance,* of Concord (*Mr. David Wolowitz* orally), for the defendant Louis F. Zuccaro.

*New Hampshire Legal Assistance,* of Concord (*Mr. Bjorn R. Lange* orally), for the defendant Edward Joshua Butler.

*David H. Souter,* attorney general, *Wilbur A. Glahn III,* assistant attorney general, and *David W. Marshall,* attorney (*Mr. Glahn III* orally), for the state.

BOIS, J.   In separate proceedings, the respondents herein, Edward Joshua Butler and Louis F. Zuccaro, were involuntarily committed to the New Hampshire Hospital pursuant to RSA ch. 135-B (Supp. 1975). They were each found by the Probate Court (*Cushing,* J.) to be "in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself or others" and were committed for a period not to exceed ninety days

and four months, respectively. The central issue in both cases is the standard of proof by which the commitment criterion must be proven.

The evidence as to both respondents was conflicting in part and subject to varying inferences and is only briefly outlined here. Mr. Butler had previously been admitted to the state hospital on three occasions and normally presented himself in a "dramatic, theatrical" way. The instant commitment was precipitated when Mr. Butler was informed that his brother had suffered complications from heart surgery and was in frail health. Upset by this news, respondent himself went to the hospital and asked to be admitted. While being escorted to a doctor, he became disorderly and had to be restrained. Officers then drove him to the police station for the purpose of charging him with disorderly conduct. It is alleged that during this trip respondent "threatened to use a police officer's gun and shoot someone to get the death penalty reinstated." Upon his return from the station, an examining doctor found respondent's mental state to be so disturbed as to constitute a danger to himself and others. A petition for involuntary commitment was filed the following day.

Mr. Zuccaro also had previously been admitted to the state hospital. The petition seeking his involuntary commitment alleged certain instances of bizarre behavior stemming from a delusion that certain nocturnal creatures were out to get him. As a part of this delusion, respondent insisted that lights be turned off at night; also, respondent told his mother that he wished she would "have a heart attack" and thus be spared "what was going to happen." An examining psychiatrist testified that respondent might, if untreated, lapse into a delusion which could result in suicide. Respondent told this doctor that his behavior had been a "joke."

In both cases, respondents moved that the court rule, as a matter of law, that the burden was on the petitioner to prove beyond a reasonable doubt that the respondent was then in such a condition as a result of mental illness as to create a potentially serious likelihood of danger to himself or others. In addition thereto, respondent Butler moved that the court rule that the state had the burden of proving beyond a reasonable doubt—or in the alternative by clear and convincing evidence—that there were no less restrictive alternatives to involuntary commitment. The motions were denied and respondents urge that this constitutes error.

At the outset, we confront the state's contention that these appeals must be dismissed on the ground of mootness since both respondents have completed their confinement and are now discharged from the hospital. Relying on *Dolcino v. Thalasinos*, 114 N.H. 353, 321 A.2d 107 (1974), which similarly involved release during the course of litigation, the state argues that neither respondent has any further interest in his appeal.

■■ "[T]he question of mootness is not subject to rigid rules but 'seems, rather, to be regarded as one of convenience and discretion.'" *Hood & Sons v. Boucher*, 98 N.H. 399, 401, 101 A.2d 466, 468 (1953). "A decision upon the merits may be thought justified where there is a pressing public interest involved . . . ." *State v. Swift*, 101 N.H. 340, 342, 143 A.2d 114, 116 (1958). For the reasons set out below, we hold that, even assuming *arguendo* that the controversy is moot as to these respondents, the public interest exception to the mootness doctrine justifies our proceeding to the merits of the instant appeals. *See Littlefield v. N.H. Interscholastic Athletic Assoc.*, 117 N.H. 183, 370 A.2d 645 (1977); *Hinse v. Burns*, 108 N.H. 58, 226 A.2d 865 (1967).

The respondents assert that various probate judges hearing commitment petitions do not apply a uniform standard of proof to the "likelihood of danger" criterion for involuntary commitment. RSA 135-B:26 (Supp. 1975). The state has not denied that such a lack of uniformity exists. The courts are thus apparently applying differing standards of proof to similarly situated petitionees, although the same "massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 509 (1972), is at stake in all cases. There can be no justification for varying standards of proof in such proceedings, because they may culminate in a deprivation of an individual's most precious freedom—his personal liberty. We agree that lack of uniformity in the standard of proof "contravenes the principle that all citizens are entitled to equal protection of the law." There is thus a pressing public interest calling for our resolution of this issue.

■ Another issue raised in these appeals, that of whether the state must prove the absence of less restrictive alternatives to involuntary commitment, demonstrates additional confusion in the proper application of RSA ch. 135-B (Supp. 1975). The "substantial social costs stemming from continued uncertainty in the law," Kates and Booker, *Mootness in Judicial Proceedings: Toward a*

*Coherent Theory,* 62 Calif. L. Rev. 1385, 1413 (1974), further establish the pressing public interest in a decision on the merits.

■■ The public interest exception to the mootness doctrine should be invoked cautiously, for "a case should not be heard when the parties' interests are not sufficiently adverse to ensure proper and effective presentation of the arguments for each side." Kates and Booker, *supra* at 1387. However, we are satisfied that these appeals are not essentially "abstract, feigned, or hypothetical." *Sibron v. N.Y.,* 392 U.S. 40, 57 (1968). The state has an interest in preserving the contested commitment orders of the court. The respondents' genuine interest in reversing those orders offers compelling evidence of the adversity of the parties. Although discharge remedies the immediate deprivation of liberty, it cannot free one from the less direct consequences of an adjudication that he is "in such mental condition . . . as to create a . . . likelihood of danger to himself or to others." RSA 135-B:26 (Supp. 1975). Respondents' interest in securing their freedom from the "continuing disability imposed by the stigma of commitment," Note, *Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv. L. Rev. 1190, 1201 (1974), expresses sufficient adversity to "ensure adequate presentation of all arguments bearing on the issues presented." Kates and Booker, *supra* at 1402. [Footnote omitted.] Finally, we note that our functional competence to proceed to the merits of these appeals is ensured by the parties' thorough briefing and arguing of the issues.

Despite the state's contention to the contrary, *Dolcino v. Thalasinos,* 114 N.H. 353, 321 A.2d 107 (1974), does not control our disposition of the instant appeals. *Dolcino* involved an analogous fact situation and presented similar issues but less than one year after the statute took effect. Now, more than four years after its enactment, problems in its application require our finding the public interest which was not present at that time.

For these reasons, we proceed to the merits of the instant appeals.

RSA 135-B:26 (Supp. 1975) provides the criterion for involuntary commitment but does not define the standard of proof by which mental illness and potential dangerousness must be determined. The state agrees that constitutional due process standards apply to these commitments but argues that the constitution does not mandate the "beyond a reasonable doubt" standard of proof requested by the respondents herein.

■ The function of the standard of proof is "to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship,* 397 U.S. 358, 370 (1970) (Harlan, J., concurring). Of course, it is inevitable, where facts are in dispute, that the trier of fact will sometimes be wrong in his findings. *Id.* The choice of standard of proof influences which party will bear the risk of such erroneous findings: "As the required degree of certainty increases, the risk of error will shift; any error in the decisionmaking process will be increasingly likely to disadvantage the party who has the burden of proof." Note, *Development in the Law—Civil Commitment,* 87 Harv. L. Rev. 1190, 1297 (1974).

■ The standard chosen may be said to reflect "the comparative social costs of erroneous factual determinations" *In re Winship,* 397 U.S. at 370 (Harlan, J., concurring). In a criminal prosecution, the reasonable doubt standard is required as a matter of due process, since the criminal defendant's "transcending" interest in liberty requires that the risk of error as to the defendant be reduced by " 'impress[ing] on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' " *Id.* at 364; *Speiser v. Randall,* 357 U.S. 513, 525–26 (1958); *State v. Phinney,* 117 N.H. 145, 370 A.2d 1153 (1977).

In *Winship* the United States Supreme Court held that proof beyond a reasonable doubt was required as a matter of due process in adjudicatory juvenile delinquency hearings. The court was unpersuaded by arguments attempting to distinguish juvenile proceedings from adult criminal prosecutions on the grounds that a juvenile adjudication is "civil" in nature, and that the goal of such proceedings is rehabilitation rather than punishment. It concluded that a proceeding in which a juvenile may be stigmatized as a delinquent and subjected to the loss of liberty for years is comparable to an adult criminal prosecution. *In re Winship,* 397 U.S. at 366 (1970).

In our view the court's analysis in *Winship* applies equally to the involuntary commitment context. "Due process of law is not to be circumvented by use of the term civil as applied to proceedings which may have the same effect as criminal proceedings . . . ." *In re Miller,* 98 N.H. 107, 108–09, 95 A.2d 116, 117 (1953). The loss of liberty and stigmatization present in the involuntary commitment setting are fully comparable to the deprivations attend-

ing a criminal conviction. *In re Ballay*, 482 F.2d 648, 668–69 (D.C. Cir. 1973). The deprivation of liberty is obvious, and is not, as to the person mistakenly committed, ameliorated by the fact that "treatment" may be dispensed. *Id.* at 667. Nor is the potential deprivation of liberty rendered significantly less threatening by the fact that an order of involuntary commitment is limited to a two-year period and may (as in the instant cases) extend only for a matter of months. Days and months are precious commodities to one erroneously confined. As for stigmatization, we have no doubt of the accuracy of the observation by the California Supreme Court that an enlightened view of mental illness "does not yet prevail" and that "the former mental patient is likely to be treated with distrust and even loathing; he may be socially ostracized and victimized by employment and educational discrimination." *People v. Burnick*, 14 Cal. 3d 306, 321, 535 P.2d 352, 362 (1975). Clearly, then, the individual erroneously and involuntarily committed to a mental hospital is subject to the most grievous sort of loss. This we acknowledged when in *Gibbs v. Helgemoe*, 116 N.H. 825, 828, 367 A.2d 1041, 1043 (1976), we noted "It is clear that in involuntary confinement hearings, whether civil or criminal, the person involved is deprived of his liberty which constitutes a grievous loss."

The state's principal objection to a reasonable doubt standard is that it is "unworkable and weighs the scale too heavily in favor of the individual interest in liberty, to the detriment of the state's interest in ensuring that dangerous persons receive treatment and do not harm others." The state's "unworkability" argument is that:

> Since no one can predict dangerousness, it is completely unreasonable and impractical to require a standard of proof which simply cannot be met. Dangerousness is not based on objective facts but on a subjective and predicative state of mind. It can never be proven "beyond a reasonable doubt." Accordingly, since it is impossible for a psychiatrist to reach such a firm conclusion regarding future behavior beyond a doubt, it is also impossible to expect that a judge could reach such a conclusion.

While it is undoubtedly true that some persons who might be committed under a lesser standard will "go free" under a reasonable doubt standard, the state's fear that disturbed persons can *never* be committed is not persuasive. We note that it is not dan-

gerousness in any absolute sense of which the trier of fact must be convinced, but rather "a potentially serious likelihood" of dangerousness. It is not difficult to conceive of circumstances in which evidence of past conduct and mental disability will convince "beyond a reasonable doubt" of a potentially serious likelihood of dangerousness. "Proof of mental state . . . is a commonplace in the law, and despite the difficulty of establishing many controverted facts in a criminal trial, we steadfastly adhere to the reasonable-doubt burden of proof." *United States ex rel. Stachulak v. Coughlin,* 520 F.2d 931, 936 (7th Cir. 1975), *cert. denied,* 424 U.S. 947 (1976).

We are not convinced of even the relevance of this "workability" argument. The reasonable doubt standard is compelled by N.H. Const. pt. I, art. 15 because of the grievous loss attendant upon an erroneous commitment decision. The certitude required as a matter of due process reflects the severity of the deprivation imposed—not the difficulties which may inhere in the proof of the commitment criteria imposed by the legislature. "The law, in short, does not weaken the standard of proof merely because the evidence is weak." *People v. Burnick,* 14 Cal. 3d 306, 330, 535 P.2d 352, 368 (1975).

If anything, the predictive nature of the ultimate finding and the frequently conflicting opinions of psychiatric experts, *see People v. Burnick,* 14 Cal. 3d at 326–31; Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U. Pa. L. Rev. 439, 451 (1975), reinforce our determination to impose a standard of proof that will ensure the utmost care in reaching an involuntary commitment decision. *See* Szasz, *The Danger of Coercive Psychiatry,* 61 A.B.A.J. 1246 (1975); *State v. Phinney,* 117 N.H. 145, 370 A.2d 1153 (1977). As the First Circuit has stated in a related context, "the inherently speculative nature of psychiatric predictions, resulting in confinement not for what one has done but for what one will do, demands more than minimal procedures, particularly when such confinement is accomplished outside the traditional criminal process, with its right to jury trial and other ancient safeguards." *Sarzen v. Gaughan,* 489 F.2d 1076, 1086 (1st Cir. 1973); *see* Livermore, Malmquist and Meehl, *On the Justifications for Civil Commitment,* 117 U. Pa. L. Rev. 75 (1968).

The state perceives the reasonable doubt standard as unduly protective of the individual and harmful to the interests of society as a whole in that it creates too great a risk of erroneous release. We, however, perceive a beneficent impact on society flowing from the protection of individual liberty. " '[A] society that values the

good name and freedom of every individual has a substantial and fundamental interest'" in assuring the accuracy of decisions confining individuals against their will. *In re Ballay,* 482 F.2d at 663. The moral force of the law should not be "diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.*

■ We hold that proof beyond a reasonable doubt is required by N.H. Const. pt. I, art. 15 in determinations of mental illness and potential dangerousness under RSA 135-B:26. *In accord, Suzuki v. Quisenberry,* 411 F. Supp. 1113 (D. Hawaii 1976); *Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D. Wis. 1972), *vacated on other grounds,* 421 U.S. 957 (1975); *In re Hodges,* 325 A.2d 605 (D.C. App. 1974); *In re Pickles' Petition,* 170 So. 2d 603 (Fla. Dist. Ct. 1965); *Denton v. Commonwealth,* 383 S.W.2d 681 (Ky. 1964); *In re Andrews,* 334 N.E.2d 15 (Mass. 1975); *In re Perry,* 137 N.J. Eq. 161, 43 A.2d 885 (1945); *State v. O'Neill,* 545 P.2d 97 (Or. 1976). *See also* Comment, *Commitment and Release Standards and Procedures: Uniform Treatment for the Mentally Ill,* 41 U. Chi. L. Rev. 825, 829 (1974).

RSA 135-B:32 (Supp. 1975) outlines the state's burden of going forward by requiring the examining psychiatrist to specify in the report whether in his or her opinion the individual sought to be admitted meets the criterion of RSA 135-B:26 (Supp. 1975), whether involuntary admission is in his or her opinion necessary for the treatment of the person sought to be admitted, and what possible alternatives including the least restrictive alternative was considered.

*"The general thrust* of the statute is that involuntary commitments be utilized only when treatment other than involuntary admission would not be in the best interest of the patient and the community. The liberty of the patient is to be curtailed only to the extent necessary to protect her and the public." *Dolcino v. Clifford,* 114 N.H. 420, 421, 321 A.2d 577, 578 (1974). (Emphasis added.)

■ In view of the procedural safeguards imposed by RSA ch. 135-B (Supp. 1975) and the requirement of proof beyond a reasonable doubt enunciated today, we hold that the absence of lesser alternative forms of treatment need not be proved beyond a reasonable doubt. We are persuaded that RSA 135-B:28 requires evidence of sufficiently recent "specific acts or actions" showing potential dangerousness before involuntary commitment be ordered.

That section provides in part: "[T]he *specific acts or actions* of the person sought to be admitted that the petitioner alleges will satisfy the criterion of RSA 135-B:26; and the names and addresses of witnesses who can testify to the occurrence of the *specific acts or actions* of the person sought to be admitted, which petitioner feels will satisfy the criterion of RSA 135-B:26 . . . ." (Emphasis added.)

Although the denial of respondents' motions to require proof beyond a reasonable doubt was erroneous, since respondents are now released, no purpose would be served in remanding for a determination of whether the proof in the proceedings below was in fact sufficient to satisfy this standard. *See In re Ballay*, 482 F.2d 648, 669 (D.C. Cir. 1973). Accordingly, we reverse both committal decrees.

*So ordered.*

GRIMES, J., did not sit; the others concurred.

ON MOTION FOR REHEARING: After the foregoing opinion was filed, the plaintiffs moved for rehearing.

*Motion for rehearing denied.*

GRIMES, J., concurs as well, having reviewed the briefs, record, and motion for rehearing. *See Russell v. Dyer*, 43 N.H. 396 (1861). December 21, 1977.