COMMONWEALTH *vs.* LEROY E. JARVIS.

Worcester.   October 16, 1973. — March 8, 1974.

Present: ROSE, KEVILLE, & GOODMAN, JJ.

*Sex Offender. Practice, Civil,* Sex offender. *Evidence,* Of sexual misbehavior. *Words,* "Sexually dangerous person."

A finding that the defendant in a proceeding under G. L. c. 123A, § 6, was a "sexually dangerous person" within § 1 was not warranted, and the proceeding must be dismissed, where, although the defendant had been convicted of "assault to rape" and an unnatural act upon a woman over sixteen years of age on one occasion, there was no evidence that such behavior of the defendant was "compulsive" nor evidence of any other or "repetitive" sexual misbehavior on his part.   [8-13]

PETITION for commitment filed in the Superior Court on May 13, 1971.

The case was heard by *Meagher,* J.

*John M. Griffin* for the defendant.

*Stanley J. Jablonski,* Assistant District Attorney, for the Commonwealth.

GOODMAN, J.   In proceedings conducted under G. L. c. 123A, § 6 (as most recently amended by St. 1969, c. 838, § 58), the defendant, Leroy E. Jarvis, was found to be a sexually dangerous person and was committed to the treatment center at Bridgewater for from one day to life.   The case is before us on the defendant's substitute bill of exceptions.

On October 27, 1970, the defendant was sentenced to M.C.I., Concord, after pleading guilty to indictments charging "assault to rape," an unnatural act, assault and battery with a dangerous weapon, and furnishing liquor to a minor.   The sentences were concurrent.   Thereafter, proceedings were begun under G. L. c. 123A and on May 13, 1971, the district attorney filed a petition for the defendant's commitment to the treatment center at

Bridgewater. At the hearing on the petition Dr. Aviles, a licensed physician specializing in psychiatry and acting as a senior psychiatrist at Bridgewater, and Dr. Friedman, a consulting psychiatrist, each testified on behalf of the Commonwealth that, in his opinion, the defendant was a sexually dangerous person.[1] Dr. Lebeaux, a diplomate of the American Board of Psychiatry, appointed by the court and paid by the county, testified that, in his opinion, the defendant was not a sexually dangerous person. The defendant and Sandra Jarvis, his former wife, with whom he had four children, testified on his behalf. The defendant's criminal record was also introduced in evidence. See *Commonwealth* v. *Bladsa,* 362 Mass. 539 (1972). The only issue raised by the defendant's substitute bill of exceptions with which we need concern ourselves is whether there was sufficient evidence to warrant a finding that the defendant was a sexually dangerous person. Since we hold the evidence insufficient and that the petition must be dismissed, it is not necessary to deal with the defendant's other contentions.

The elements of proof required for a finding that a defendant is a "sexually dangerous person" are set out in the definition, found in G. L. c. 123A, § 1.[2] In *Peterson, petitioner,* 354 Mass. 110, 117 (1968), the Supreme Judicial Court said (answering a contention that the definition and particularly the word "misconduct" were

---

[1] These two psychiatrists had signed the report which was made after the observation period of not more than sixty days (G.L. c. 123A, § 4) and on which the petition was based.

[2] "The words 'sexually dangerous person' as used in this chapter shall have the following meaning: — Any person whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive behavior and either violence, or aggression by an adult against a victim under the age of sixteen years, and who as a result is likely to attack or otherwise inflict injury on the objects of his uncontrolled or uncontrollable desires."

unconstitutionally vague): "Whereas this word, if stand-
ing alone, might suggest that a person was sexually
dangerous for almost any act which offended someone's
notion of propriety (see *Musser* v. *Utah,* 333 U. S. 95),
*the statute sets forth clearly its meaning in the
subsequent clauses.* The statutory definition requires [1]
repetitive or compulsive behavior, [2] violence or aggres-
sion by an adult against a person under the age of sixteen
and [3] a likelihood that injury will be [in]flicted" (em-
phasis supplied). Paraphrasing this in terms relevant to
this case, commitment as a sexually dangerous person must
be based on evidence of repetitive acts of sexual miscon-
duct which are also violent or on evidence of behavior
which is compulsive and violent.[3] See 1959 Ann. Surv. of
Mass. Law, § 10.3, p. 96. The Supreme Judicial Court
went on to say in the *Peterson* case, "The statute reaches
those persons whose *behavior has reasonably demon-
strated* that they are such a danger to society as to
require confinement. The language resembles that ap-
proved by the Supreme Court in *Minnesota ex rel.
Pearson* v. *Probate Court of Ramsey County,* 309 U. S.
270, 272-274. See *Sas* v. *Maryland,* 334 F. 2d 506, 514
(4th Cir.)" (emphasis supplied).[4]

---

[3] Since we do not find the requisite repetitive or compulsive
behavior present and since there is no contention that the defendant
was in any way involved with a child "under the age of sixteen years"
(the victim in the incident of September 4, 1970, was nineteen), we
need not determine the scope of the requirement for "aggression by
an adult against a victim under the age of sixteen years" and its exact
relationship to the other requirements. See McGarry and Cotton, A
Study in Civil Commitment: The Massachusetts Sexually Dangerous
Persons Act, 6 Harv. J. Legis. 263, 273; Tenney, Sex, Sanity and
Stupidity in Massachusetts, 42 B. U. L. Rev. 1, 15; Note, Out of
Tune with the Times; The Massachusetts SDP Statute, 45 B. U. L.
Rev. 391, 402.

[4] See McGarry and Cotton, *supra* (n. 3), at 264-269, and Tenney,
*supra* (n. 3), at 12-16, for discussions of the statutory history and
previous formulations. St. 1947, c. 683, § 1 ("habitual course of
misconduct in sexual matters"), and St. 1954, c. 686, § 1 ("course of

The court was thus careful to interpret the statute so as to specify a concrete basis in past sexual misconduct for "a projection of future conduct" (*Sarzen* v. *Gaughan*, 489 F. 2d 1076, 1084 [1st Cir. 1973]), requiring "evidence of past conduct pointing to probable consequences . . .." *Minnesota ex rel. Pearson* v. *Probate Court of Ramsey County*, 309 U. S. 270, 274 (1940). This recognized the basically recidivist character of statutes of this kind. See *Specht* v. *Patterson*, 386 U. S. 605, 610 (1967); *Millard* v. *Harris*, 406 F. 2d 964, 972 (D. C. Cir. 1968). The requirement for repetitive or compulsive sexual misconduct has been termed "a comparatively plausible approach" (Note, The Plight of the Sexual Psychopath: A Legislative Blunder and Judicial Acquiescence, 41 Notre Dame Lawyer 527, 530); it mitigates the "inherently speculative nature of psychiatric predictions" (*Sarzen* v. *Gaughan*, 489 F. 2d 1076, 1086 [1st Cir. 1973], and material cited), and the "very real constitutional problems surrounding incarceration predicated only upon a supposed propensity to commit criminal acts." *Cross* v. *Harris*, 418 F. 2d 1095, 1101 (D. C. Cir. 1969). See also *Tippett* v. *Maryland*, 436 F. 2d 1153, 1160 (4th Cir. 1971) (Sobeloff, J., concurring and dissenting). It thus goes at least some way in "substitut[ing] functional legal criteria for the medical model . . .." Dershowitz, Psychiatry in the Legal Process: "A Knife that Cuts Both Ways," in The Path of the Law from 1967, pp. 71, 83 (Sutherland ed. 1968).

Analyzing the record in terms of the explanation in the *Peterson* case, we find no evidence of repetitive or compulsive sexual misbehavior sufficient to provide a point of

---

misconduct in sexual matters"). Compare the District of Columbia statute which requires "a course of repeated misconduct . . .." D.C. Code (1973), § 22-3503 (1). See *Lomax* v. *District of Columbia*, 211 Atl. 2d 772, 774 (D.C. App. 1965). See also Am. Law Inst., Model Penal Code, § 7.03 (3) (P. O. D. 1962), as reproduced in A. B. A., Standards Relating to Sentencing Alternatives and Procedures, Appendix B, p. 315 (Approved Draft, 1968).

departure for a finding that the defendant is a sexually dangerous person. The defendant's criminal record does not indicate, and there was no other evidence of, any sexual misconduct except for the one incident of September 4, 1970. The defendant's criminal record contained mainly convictions for drunkenness and other minor offenses,[5] none of which appear to have been sex related.

Nor was there sufficient evidence of "compulsive behavior." The convictions for "assault to rape" and "unnatural act" are not, without more, sufficient evidence of compulsive behavior. "[A] sexual offense, such as rape . . . may not denote a sexual deviation. A charge such as indecent assault may comprise . . . sexually non-deviant acts such as accosting a woman in a park with 'normal' sexual aims." Sadoff, Sexually Deviated Offenders, 40 Temple L. Q. 305, 309, n. 15, quoting Gray and Mohr, Follow-up of Male Sexual Offenders, in Sexual Behavior and the Law, pp. 742, 743 (Slovenko ed. 1965). See also Cohen, Garofalo, Boucher and Seghorn, The Psychology of Rapists, 3 Seminars in Psychiatry, No. 3, 307, 311-312. It might well be, as the Legislature apparently felt, that a single act of sexual misconduct may be so bizarre and irrational as to permit the inference by a trier of fact that it was uncontrollable, and thus provide the basis for a determination that it was compulsive behavior. When such an act is also violent, there is a statutory basis for a prediction that the defendant is a sexually dangerous person. However, there was nothing in the testimony of the psychiatrists for the Commonwealth (the only evidence it produced apart from records) which indicated that the incident of

---

[5] The record contained one conviction in a District Court for assault and battery, for which he was given a suspended sentence in a house of correction for two years. Dr. Aviles indicated reliance on a conviction for "robbery with knife" in Connecticut, but the defendant introduced an official court record showing that there was no conviction and that the charge had been "nolle prossed."

September 4, 1970, manifested compulsive conduct.[6] Some details of the incident came from Dr. Lebeaux, who testified "that Jarvis had been led into the crime . . . [by] another person who appeared to be a rather aggressive, authoritative figure . . .."[7] We conclude that the evidence did not permit a finding that the incident of September 4, 1970, was the result of compulsive behavior; nor was there any evidence of other sexual misconduct.

*Exceptions sustained.*
*Petition dismissed.*

---

[6]Dr. Aviles testified on cross-examination by the defendant (as set out in the substitute bill of exceptions) "that according to the victim['s] . . . version of the crimes for which Jarvis was sentenced to Concord: she met Jarvis in a bar on a particular afternoon, she arrived at the bar at noontime; that at the bar she and a female companion met Jarvis and another person; that together they drank at that bar until 5:00 in the afternoon; that at that time the victim left her female companion and accompanied Jarvis and another out of the bar; that after leaving the bar, the victim, Jarvis and the other stopped off and purchased a case of beer; that together they went to the apartment of a Mr. [C]; that there they drank and danced for sometime." Dr. Friedman did not even mention the incident. Perhaps the failure of the Commonwealth's psychiatrists to concern themselves with the statutory requirements may have been the result of an erroneous view in this case by the staff of the treatment center that the statute does not require a finding of repetitive or compulsive conduct, but that these are merely relevant factors.

[7]He further testified on cross-examination by the Commonwealth that he was aware that the records indicated (there was no objection; cf. *Commonwealth* v. *Bladsa*, 362 Mass. 539 [1972]; *Commonwealth* v. *Lamb*, 1 Mass. App. Ct. 530 [1973]) "that Jarvis and the others on this day went to this apartment and danced and drank beer; that Jarvis became upset and said to the victim 'OK, you want to tease?'; that the victim was knocked to the floor by Jarvis; that Jarvis slashed the victim with a razor blade . . . that the blades were provided by the other person and given to Jarvis to threaten the victim; that the assault or battery was said to be accidental and not intentioned; that Dr. Lebeaux was aware that Jarvis performed an unnatural act on the victim."