FLOYD J. ANDREWS, JR., petitioner.

Suffolk.   March 7, 1975. — August 13, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Sex Offender.   Practice, Civil,* Sex offender.   *Constitutional Law,* Due process of law, Equal protection of laws, Sex offender.   *Evidence,* Hearsay; Of sexual misbehavior; Sex offender; Opinion: expert, Judicial notice.

At the hearing of a petition under G. L. c. 123A, § 6, resulting in the commitment for an indeterminate period to a treatment center as a sexually dangerous person of one convicted of a sexual offense and of assault and battery, records of such convictions and of an earlier conviction of the defendant of rape were properly admitted

---

in evidence under § 5 [472-474]; and testimony of psychiatrists who, pursuant to § 4, examined the defendant and were supplied with copies of his "court record" and of his "probation record," which contained "a history" of his "previous offences," was admissible even though their opinions were based to some extent on information contained in police and other official reports [475].

This court took judicial notice in a habeas corpus proceeding of the record in a writ of error proceeding here by the same petitioner. [476]

At the hearing of a petition under G. L. c. 123A, § 6, for the commitment to a treatment center of one who had pleaded guilty and been sentenced for a sexual offense against a girl and for assault and battery on a boy, any error in allowing the arresting police officer who testified at the trial to repeat his trial testimony at the hearing, although his testimony was partially based upon information contained in police reports and was not within his personal knowledge, was harmless beyond a reasonable doubt where it appeared that in every material respect the officer's testimony at the trial and at the hearing was the same, and that both the defendant and his counsel declined to examine the victims at the trial. [476-477]

At a commitment hearing under G. L. c. 123A, a transcript of the testimony at prior hearings or trials in the same line of proceedings which resulted in the commitment hearing may be admitted in evidence. [478]

Commitment of one for an indeterminate period to a treatment center as a sexually dangerous person prior to the decision in *Commonwealth* v. *Bladsa*, 362 Mass. 539 (1972), was not invalidated by the admission of hearsay evidence similar to the evidence erroneously admitted in such case. [475]

Under the equal protection clause of the Fourteenth Amendment to the United States Constitution, any significant procedural rights granted to persons involuntarily committed for an indeterminate period to the State hospital at the Massachusetts Correctional Institution, Bridgewater, as mentally ill persons pursuant to G. L. c. 123, § 18, must be extended to a person involuntarily committed to the treatment center at such institution as a sexually dangerous person pursuant to c. 123A, § 6, at least when the latter commitment extends beyond the limits of the maximum sentence which was imposed on the sexually dangerous person following his conviction. [479-481]

A prisoner subjected to initial observation and final commitment under G. L. c. 123A, § 6, as a sexually dangerous person is not denied equal protection of the laws by being committed under the procedures set out in § 6, as judicially construed, rather than under

the procedures set out in c. 123 for initial observation and final commitment of a mentally ill person. [481-486]

In order to obtain an original order of commitment at the hearing of a petition under G. L. c. 123A, § 6, for the commitment of an allegedly sexually dangerous person to a treatment center for an indeterminate period, the Commonwealth must prove beyond a reasonable doubt that the defendant is sexually dangerous at the time of the hearing, and in order to obtain a subsequent order of commitment at a hearing of a petition by the committed person under § 9 for release from the center the Commonwealth must prove beyond a reasonable doubt that at the time of the later hearing he continues to be sexually dangerous. [486-490]

PETITION for a writ of habeas corpus filed in the Supreme Judicial Court for the county of Suffolk on August 23, 1973.

The case was reserved and reported by *Kaplan, J.*

*Gordon A. Martin, Jr.,* for the petitioner.

*Dennis J. LaCroix,* Assistant Attorney General, for the respondent.

QUIRICO, J. This is a petition for a writ of habeas corpus originally filed with the clerk of this court for Suffolk County and reserved and reported to the full court by a single justice, without decision, on the petition and a stipulation of facts. The petitioner seeks his release from the treatment center at the Massachusetts Correctional Institution at Bridgewater (Bridgewater) to which he has been committed by order of a Superior Court judge, acting under G. L. c. 123A, § 6, for an indeterminate period of from one day to life as a sexually dangerous person (SDP). G. L. c. 123A, § 1. We review the background of this case.

On October 23, 1964, the petitioner pleaded guilty in the Superior Court in Suffolk County to indictments charging him with indecent assault and battery on a child under fourteen, G. L. c. 265, § 13B, and assault and battery, G. L. c. 265, § 13A. After hearing testimony from the arresting officer about the incidents and after listening to recommendations from the assistant district attorney and defense counsel as to sentencing, the judge sentenced

the petitioner to four to five years at the Massachusetts Correctional Institution at Walpole (Walpole) on the indictment charging indecent assault and battery on a child under fourteen and to two and one-half years at the Suffolk County house of correction on the indictment charging assault and battery. The sentences were to run consecutively.

On February 11, 1965, the petitioner was transferred from Walpole to the Massachusetts Correctional Institution at Norfolk (Norfolk). On November 16, 1965, the acting superintendent of Norfolk moved for and obtained an order under G. L. c. 123A, § 6, that the petitioner be committed to the treatment center at Bridgewater for a sixty-day period of observation and diagnosis to determine whether he was an SDP. The resulting psychiatric report indicated that he was an SDP. On February 23, 1967, a hearing was conducted in the Superior Court on a petition filed by the district attorney that the petitioner be committed to the treatment center for an indeterminate period as an SDP. After the hearing, the judge found the petitioner to be an SDP and granted the district attorney's petition.

More than two years after his indeterminate commitment to the treatment center, the petitioner filed a petition for a writ of error, alleging that his guilty pleas to the criminal indictments were made without his knowing all the ramifications of such pleas, in particular, that he might be committed under G. L. c. 123A as an SDP. In the writ of error proceeding, the petitioner alleged that the circumstances of his pleas did not satisfy the knowing waiver requirement of *Boykin* v. *Alabama*, 395 U. S. 238, 243-244 (1969). A single justice of this court affirmed the judgments, being unconvinced that the guilty pleas were made without knowledge of the possible c. 123A consequences, and concluding that *Boykin* v. *Alabama* was inapplicable to the petitioner's case because that decision postdated the petitioner's pleas and is not retroactive. We overruled the petitioner's exceptions

to the single justice's actions in *Andrews* v. *Commonwealth*, 361 Mass. 722 (1972). In August, 1973, the petitioner filed the petition commencing the present proceeding, which was reserved and reported by the single justice when the parties perfected the record by filing the stipulation of facts in October, 1974.

The stipulation of facts suggests that four questions are presented in this case. The first two questions together ask, in effect, whether the admission at the indeterminate commitment hearing of evidence relating to the petitioner's prior convictions of two sex offenses (see G. L. c. 123A, §§ 3, 4) violated the rule of *Commonwealth* v. *Bladsa*, 362 Mass. 539 (1972). As explained below, we find no *Bladsa*-type violation in this case. The other two questions together ask, in effect, whether the petitioner's Federal and State constitutional rights to due process and equal protection are violated by the denial to SDPs of adequate procedural safeguards. The petitioner particularly objects to the denial to SDPs committed under G. L. c. 123A, § 6, of certain safeguards granted mentally ill persons committed under various provisions of G. L. c. 123. As explained in the latter part of this opinion, we find constitutional infirmity in the currently operative procedures relative to the commitment and indeterminately continued detention of SDPs. We accordingly conclude that the procedural rights accorded those prisoners subjected to c. 123A must be upgraded in specified respects.

I. THE HEARSAY ISSUE.

In *Commonwealth* v. *McGruder,* 348 Mass. 712 (1965), cert. den. 383 U. S. 972 (1966), reh. den. 384 U. S. 947 (1966), we examined the provisions in G. L. c. 123A, § 5, that it "shall be competent to introduce evidence [in a commitment proceeding] of the person's past criminal and psychiatric record and any other

evidence that tends to indicate that he is a sexually dangerous person. Any psychiatric report filed under this chapter shall be admissible in evidence in such proceedings." We related this provision to the provision in § 4 that the examining psychiatrists should have access to the court and probation records of the examinee and that "[t]he probation record shall contain a history . . . [of] such person's previous offences and previous psychiatric examinations and such other information as may be helpful to assist such psychiatrists in making their diagnosis." We concluded that these provisions supported the hearing judge's overruling of objections made to the admission of the oral testimony of two examining psychiatrists who based their determination of the defendant's sexual dangerousness in large part on information contained in records of the Department of Correction. We recognized that these provisions were "a very radical departure" from ordinary evidentiary rules, but held that "the Legislature has made its policy clear in this regard." *Id.* at 715. We pointed out that "[i]f the opinions of the examining psychiatrists are based on incorrect information it would be open to a defendant . . . to refute it." *Id.* at 716.

In *Commonwealth* v. *Bladsa,* 362 Mass. 539 (1972), we set rather narrow limits on the extent of the *McGruder* holding, but did not overrule it. In *Bladsa,* we held that it was reversible error to allow the examining psychiatrists to testify "in detail as to many sex offences committed by the defendant involving young boys, all of which information they had obtained from police reports and 'the official police version.'" Id. at 540. We said: "The evidence of sexual misbehavior was obviously hearsay, and since it was not made admissible under the statutes it ought not to have been received. Our particular concern here is not with the statutory provisions for the supplying of information and records to psychiatrists, but with the admissibility in evidence of that information and those records. . . . We conclude that the only evidence

which is rendered admissible by the terms of G. L. c. 123A, §§ 4, 5 and 6, is that described in § 5, viz.: past criminal and psychiatric records of the defendant, and any psychiatric report filed under c. 123A." *Id.* at 540-541. The admissibility of other evidence in c. 123A proceedings is thus governed by the customary rules pertaining thereto. *Id.* at 541, fn. 2. The *McGruder* case was distinguished on the ground that it permitted only that police and other reports might be supplied to the examining psychiatrists, not that such reports could thereafter be themselves introduced in evidence, either directly or by repetition by expert witnesses. *Id.* at 541.

In the present case, the petitioner apparently asserts that the *Bladsa* holding, or the implications of that holding, rendered improper the admission in evidence, at the hearing which resulted in his indeterminate commitment, of (1) the records of the convictions for indecent assault and battery and assault and battery, sentences for which the petitioner was then serving, (2) the record of the conviction of the petitioner in 1948 in Texas on a charge of rape, (3) the testimony of the examining psychiatrists, who based their opinions of the petitioner's sexual dangerousness in part on the fact that the petitioner had been convicted of the offenses noted in (1) and (2) above and in part on the circumstances of the Massachusetts convictions as described in police and other reports, as well as in part on interviews with and observations of the petitioner, and (4) the testimony of a police officer regarding the circumstances of the Massachusetts crimes.

As to (1) and (2), the records of convictions of rape, assault and battery, and indecent assault and battery on a child under fourteen, the petitioner argues that they should have been excluded because "the fair determination of sexual dangerousness is . . . [severely] prejudiced by the presentation of evidence of past criminal convictions." The short answer here is that § 5 provides that at a commitment hearing "it shall be competent to

introduce evidence of the person's past criminal . . . record." Nothing in the *Bladsa* decision suggests that this provision is invalid. Indeed, it is difficult to conceive of evidence which is more probative of sexual dangerousness and more surrounded with assurances of accuracy than records of convictions of violent sex crimes.

As to (3), the testimony of psychiatrists who based their opinions to some extent on information contained in police and other official reports, the similarly short answer is that § 4 provides that the examining psychiatrists shall be supplied with "copies of the court record . . . and . . . the probation record . . . [which] shall contain a history . . . [of] such person's previous offences . . . ." Nothing in the *Bladsa* decision suggests that this provision is invalid. We note in passing that the records in question are official records and, therefore, possess some likelihood of trustworthiness. See *Commonwealth* v. *McGruder,* 348 Mass. at 715 (1965). We are aware, however, that the records contain no guarantee of accuracy, and agree with the United States Court of Appeals for the First Circuit that a person subjected to c. 123A proceedings "must be afforded a reasonable opportunity to see, examine, and correct, where justified, the historical data which is to be used in reaching the critical opinions on his sexual dangerousness." *Sarzen* v. *Gaughan,* 489 F. 2d 1076, 1085 (1st Cir. 1973). Nevertheless, this requirement cannot in our view be stretched to prevent all use by psychiatrists of reports containing hearsay information. Indeed, the requirement that the person subjected to c. 123A proceedings be granted access to these reports itself arises from an awareness that the information in these reports may in fact be used by the examining psychiatrists in making their diagnosis. That such information, although inadmissible itself, may directly or indirectly form part of the basis for admissible expert opinion testimony is typical of much expert testimony. McCormick, Evidence, § 15 (2d ed. 1972). See *Finnegan* v. *Fall River Gas Works Co.* 159 Mass. 311,

312-313 (1893); *Moore* v. *Cataldo*, 356 Mass. 325, 330-331 (1969).

As to (4), the oral testimony of the police officer regarding the circumstances leading up to the two Massachusetts convictions in 1964, this evidence, although relevant, may have been technically inadmissible under the *Bladsa* rule because it was apparently partially based on information which was contained in police reports and which was not all within the officer's personal knowledge. We believe, however, that any error in this regard was harmless beyond a reasonable doubt.

As we stated at the beginning of this opinion, the judge who sentenced the petitioner for his Massachusetts crimes, after receiving the petitioner's pleas of guilty to the charges, heard testimony from the arresting officer about the incidents. A transcript of this hearing was part of the record in the petitioner's writ of error proceeding in this court. We now judicially notice that record. *Poland* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 342 Mass. 75, 77 and fn. 2 (1961). *Costarelli* v. *Municipal Court of the City of Boston*, 367 Mass. 35, 44 (1975).

The arresting officer who testified at the 1964 trial was the same officer who testified at the petitioner's commitment hearing. We have carefully compared the officer's testimony on the former occasion with his testimony on the latter occasion, and the two are the same in every material respect. After the officer completed his testimony on the former occasion, the petitioner's then attorney was asked by the judge, "Counsel, any questions?" The petitioner's attorney answered, "No questions." The two victims of the petitioner's crimes, a six-year old girl and an eleven-year old boy, were then present in court and had been asked to come forward. The petitioner through his attorney also declined the opportunity to examine them in relation to the incidents in question. After hearing recommendations of counsel, the judge then sentenced the petitioner.

In these circumstances, we find it difficult to see that any policy of the hearsay rule or of the confrontation clause of the Sixth Amendment to the United States Constitution was violated when the arresting officer repeated his 1964 testimony at the later commitment hearing. See *Pointer* v. *Texas*, 380 U. S. 400, 406-407 (1965); *Dutton* v. *Evans*, 400 U. S. 74, 88-90 (1970); *Tollett* v. *Henderson*, 411 U. S. 258, 266-268 (1973); *Commonwealth* v. *Mustone*, 353 Mass. 490, 492-494 (1968); *Commonwealth* v. *Clark*, 363 Mass. 467, 470-471 (1973). In short, we believe that a transcript of the testimony at prior hearings or trials, including at least those in the same line of proceedings which resulted ultimately in the c. 123A commitment hearing, may be admitted in evidence at the commitment hearing provided that the allegedly SDP had a fair opportunity to confront the adverse witnesses at the earlier proceeding. As a result of statutory provisions strengthened in the SDP's favor by our decision hereafter, SDPs will be entitled to recurrent opportunities to establish their eligibility for release. In view of this, we think it both unnecessary and unwise to require that all the original witnesses at the first trial or hearing be dragged back to court for every one of these recurrent hearings to restate testimony of ever older events, testimony which when originally made was subject to cross-examination by a defendant who was represented by counsel.

In regard to the hearsay issue, we note finally that the petitioner's commitment hearing occurred prior to the date of the *Bladsa* decision. We have no intention of suggesting by our reaching of the merits on this question that the *Bladsa* rule invalidates any commitments which antedate that decision. In any event, the remedy for a *Bladsa*-type violation would seem to be a new hearing — something to which SDPs will in any case be periodically entitled in accordance with our decision hereafter.

II. The Due Process and Equal Protection Issues.

The petitioner argues that his Federal and State constitutional rights to due process and equal protection are denied by virtue of the inadequacy of the procedural safeguards accorded to persons committed as SDPs under G. L. c. 123A, § 6, particularly when those safeguards are contrasted with the ones granted to persons committed as mentally ill persons under various provisions of G. L. c. 123. We agree with that argument in some respects and, accordingly, we afford some relief. We begin, however, by stating that we adhere to the often expressed view that the basic substantive premise of c. 123A, that persons convicted of crimes and thereafter found to be sexually dangerous may be subjected to commitment to a treatment center until cured or rehabilitated, does not constitute a denial of equal protection solely because the operation of the statute does not reach nonconvicts or convicts who are not sexually dangerous. *Peterson, petitioner*, 354 Mass. 110, 116-117 (1968). *Commonwealth* v. *Major*, 354 Mass. 666, 667-669 (1968), cert. den. 393 U. S. 1109 (1969). *Commonwealth* v. *Gomes*, 355 Mass. 479, 486 (1969). *Peterson* v. *Gaughan*, 404 F. 2d 1375, 1377-1378 (1st Cir. 1968). *Gomes* v. *Gaughan*, 471 F. 2d 794, 798 (1st Cir. 1973). See *Minnesota ex rel. Pearson* v. *Probate Court of Ramsey County*, 309 U. S. 270, 274-275 (1940). What we are concerned with here is thus not *whether* an SDP may be committed to and detained at the treatment center under c. 123A, but *how* such a person may be committed and detained. Bearing this in mind, we turn to a comparison of cc. 123A and 123.

Chapter 123A pertains in its entirety to the commitment and treatment of SDPs. Under § 6, proceedings for commitment are begun when "a prisoner under sentence in any jail, house of correction or prison . . . appears to the . . . [person] who has him in custody . . . to be a sexually dangerous person and in need of the care and

treatment provided at the center," and the "[person] who has him in custody" moves that the court commit the prisoner to the treatment center for a sixty-day period of observation and diagnosis. If the psychiatric report compiled after this period "clearly indicates that such prisoner is a sexually dangerous person," then the district attorney may file a petition for the petitioner's ultimate commitment as an SDP. If after a hearing on this petition the court finds that the prisoner is an SDP, it shall commit him to the center for an indeterminate period of from one day to life.

Under § 1 an SDP is defined as "[a]ny person whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive behavior and either violence, or aggression by an adult against a victim under the age of sixteen years, and who as a result is likely to attack or otherwise inflict injury on the objects of his uncontrolled or uncontrollable desires."

While c. 123A concerns the commitment and treatment of SDPs, c. 123 pertains in its entirety to the commitment and treatment of mentally ill and mentally retarded persons. The provision in c. 123 which most closely parallels c. 123A, § 6, is § 18. Under § 18, "[i]f the person in charge of any place of detention within the commonwealth has reason to believe that a person confined therein is in need of hospitalization by reason of mental illness at . . . Bridgewater state hospital [the hospital], he shall cause such prisoner to be examined at such place of detention by a physician or physicians . . . [who] shall report the results of the examination to the district court which has jurisdiction over the place of detention . . . ." The court may then commit the prisoner to the hospital for a thirty-day examination period. After receipt of this report, the court may, on petition and after a hearing, if one is requested, order the prisoner committed to the hospital if "it finds that (1) such person is mentally ill; (2) such person is not a proper subject for

commitment to any [other less secure] facility of the department [of Mental Health]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm." G. L. c. 123, §§ 8 (d), 18.[1]

"Mental illness" is not statutorily defined, but is defined by a Department of Mental Health Regulation as "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

The foregoing outlines of c. 123A, § 6, and c. 123, § 18, as the latter is affected by the quoted regulation, make it plain that many SDPs could be proceeded against under either statute. Moreover, it is worthy of some note that both the treatment center and the hospital are part of the same correctional institution. See G. L. c. 123A, § 2; c. 125, § 18. And it would appear that the governmental interest in protecting society from violence from the mentally ill while they are being treated would be substantially similar to the interest in protecting society from the sexually dangerous while they are being treated.

In view of the generally similar functions and effects of c. 123A, § 6, and c. 123, § 18, the Commonwealth is constitutionally bound to extend substantially similar procedural and substantive safeguards to persons affected by either statute. "*Baxstrom* [v. *Herold*, 383 U. S. 107 (1966)] held that the State cannot withhold from a few the procedural protections or the substantive requirements

---

[1] "Likelihood of serious harm" is defined in § 1 as "(1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."

for commitment that are available to all others." *Jackson v. Indiana*, 406 U. S. 715, 727 (1972). Prior to *Humphrey v. Cady*, 405 U. S. 504 (1972), it might have been argued that a statute, such as c. 123A, which applies only to persons convicted of crimes was not required to offer all the procedural safeguards of a statute, such as c. 123, which applies, at least in part, to persons who have not been convicted of crimes because the former kind of statute is merely an alternative to penal sentencing. But in response to this assertion, the *Humphrey* court said: "That argument arguably has force with respect to an initial commitment under the Sex Crimes Act, which is imposed in lieu of sentence, and is limited in duration to the maximum permissible sentence. The argument can carry little weight, however, with respect to the subsequent renewal proceedings, which result in five-year commitment orders based on new findings of fact, and are in no way limited by the nature of the defendant's crime or the maximum sentence authorized for that crime." *Id.* at 510-511.

We believe that we are compelled by the equal protection clause of the Fourteenth Amendment to the United States Constitution to hold here that any significant procedural rights granted to persons involuntarily committed under c. 123 must be extended to persons involuntarily committed under c. 123A, § 6, at least when such commitment extends beyond the limits of the maximum sentence which was imposed on the SDP following his conviction. *Baxstrom* v. *Herold, supra. Humphrey* v. *Cady, supra. Jackson* v. *Indiana, supra. Murel* v. *Baltimore City Criminal Court*, 407 U. S. 355, 357-358 (1972). *Commonwealth* v. *Druken*, 356 Mass. 503, 506-509 (1969).

Considering first the procedures employed in regard to both the initial observational commitment and the ultimate commitment, we think that c. 123A, § 6, compares rather favorably in many respects to c. 123, § 18. The frequent litigation of constitutional issues in the context of

SDP proceedings has produced a significant body of case law on the subject. Of course c. 123A itself, in relation to the ultimate commitment at least, has long provided the prisoner with prior "notice, a hearing, compulsory process, and the assistance of counsel who is entitled to receive the reports of the examining psychiatrists." *Peterson, petitioner*, 354 Mass. 110, 114 (1968). Beyond these rights, the appellate courts of this Commonwealth have granted persons proceeded against under c. 123A, § 6, numerous additional protections, including the right to discovery by means of depositions and interrogatories, *Commonwealth* v. *Pimental*, 362 Mass. 854 (1972), the right to have excluded from evidence certain hearsay statements in police and Department of Correction reports where such statements were never subject to cross-examination by a prisoner represented by counsel, *Commonwealth* v. *Bladsa*, 362 Mass. 539, 541-542 (1972), the right under G. L. c. 223, § 20B (b), inserted by St. 1968, c. 418, to keep privileged (i.e. excluded from evidence) communications made to court-appointed psychothera-pists, absent a showing that a warning was given that the communication would not be privileged, *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974), and the right not to be committed unless there is "evidence of repetitive acts of sexual misconduct which are also violent or on evidence of behavior which is compulsive and violent," *Commonwealth* v. *Jarvis*, 2 Mass. App. Ct. 8, 10 (1974), interpreting *Peterson, petitioner*, 354 Mass. 110, 117 (1968). The United States Court of Appeals for the First Circuit has determined that the prisoner has a right to notice of each critical step in the § 6 process, beginning with the prison superintendent's initial request that the prisoner be examined as a possibly SDP, a right to review the records of the Department of Correction given to the examining psychiatrists and to correct any misinformation appearing therein, and a right to counsel, appointed or otherwise, soon after the filing of a report by the psychia-

trists that the prisoner is sexually dangerous. *Sarzen* v. *Gaughan*, 489 F. 2d 1076, 1084-1086 (1st Cir. 1973).

Many of the listed protections have now been incorporated explicitly into § 6 by the Legislature. St. 1974, c. 324, §§ 2, 3. Without setting out here all the procedural protections afforded persons subjected to initial observation and final commitment under c. 123, we think it sufficient to state that we have considered them and conclude that they are in no material respect superior to those afforded persons subjected to initial observation and final commitment under c. 123A, § 6. SDPs, therefore, are not denied equal protection of the laws by being committed under the procedures set out in § 6, as that section has been judicially construed, rather than under the procedures set out in c. 123.

However, when we turn to an examination of the duration of the commitment and of the prescribed procedures by which the person committed may obtain his release, we find that SDPs are much more severely burdened than are the mentally ill committed under c. 123, including those prisoners committed under c. 123, § 18. In particular, an SDP is, according to § 6, committed to the treatment center "for an indeterminate period of a minimum of one day and a maximum of such person's natural life." Unless otherwise paroled, an SDP's only remedy is that he "shall be entitled to have a hearing for examination and discharge once in every twelve months, upon the filing of a written petition" therefor by him or by someone in his behalf. After such a hearing, the SDP may be discharged or conditionally discharged only "[u]pon a finding by the court that such person is no longer a sexually dangerous person." G. L. c. 123A, § 9. In short, the burden is on the SDP to bring the petition for his release and to prove he is no longer sexually dangerous. If he does not sustain this burden, his commitment will continue indefinitely, subject to the outcome of later annual hearings.

In contrast to the pattern established by §§ 6 and 9 of c. 123A is that established by §§ 18 and 5-8 of c. 123.

Under these latter provisions, a mentally ill prisoner committed to the hospital under § 18 must be discharged at the end of his prison sentence unless, prior to that date, he is the subject of a new commitment order by a court acting pursuant to §§ 5-8 of c. 123. Under § 8 (f), the first order of commitment is valid for a period of six months, and each subsequent order of commitment is valid for one year. Sections 7 and 8 make it clear that the burden is on the Commonwealth to move for and obtain each additional order of commitment. Under § 8 (f) and paragraphs (b) and (c) of § 7, for example, the hospital medical director must petition the local District Court for a new commitment order when the term of the previous order expires. Notice must issue to the person committed and to his nearest relative or guardian of the receipt of the petition and of the availability of a hearing within fourteen days of a request for one. By virtue of § 8 (d), the person who requests a hearing cannot be recommitted unless the court "finds that (1) such person is mentally ill; (2) such person is not a proper subject for commitment to any facility [other than the hospital] of the department [of Mental Health]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm."

In *Commonwealth* v. *Druken*, 356 Mass. 503, 509 (1969), we held that the commitment, under then G. L. c. 123, §§ 100, 105, of a defendant in a pending criminal case on the ground that the defendant was insane could not be accomplished constitutionally unless the defendant was given the procedural safeguards required by then G. L. c. 123, §§ 51 and 53. The United States Supreme Court applied the same rule in *Jackson* v. *Indiana*, 406 U. S. 715, 724 (1972). In reaching its decision, the *Jackson* court specifically concluded that committed persons charged with crimes could not be subjected to more stringent standards of release than were other committed persons: "*Baxstrom* did not deal with the standard for release, but its rationale is applicable here. The

harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release. . . . [W]e hold that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded . . . [in other cases], Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment." *Id.* at 729-730.

We believe that the *Druken* and *Jackson* cases are controlling here, and that they do not permit the disparity of burdens in the release provisions which currently exist between § 9 of c. 123A and §§ 7 and 8 of c. 123. We accordingly hold that at any annual hearing on a petition by an SDP for his release from the treatment center the Commonwealth shall have the burden of proving that as of the time of the hearing the person committed continues to be sexually dangerous. We do not transfer the obligation of filing the petition to the Commonwealth because such a transfer would require a rewriting of the statute, and that is beyond our province to do. In any case, we think that the physical act of filing a petition is an insubstantial obligation on the SDP, at least where the burden of proof which usually rests on the shoulders of a petitioner has been transferred to the respondent. We do assume, however, that the Department of Mental Health maintains records which will enable it to inform committed persons of their eligibility for periodic review on the question of their release. If no new order of commitment is issued after such review, the person is to be returned to the custody of the Department of Correction to serve the balance of his sentence, if any

such balance remains, and if the person's sentence has expired, he is to be released.

We turn finally to the question of what burden of proof the Commonwealth must satisfy in order to obtain an original or subsequent order of commitment of an allegedly SDP. Because neither c. 123A nor c. 123 specifies the burden of proof in proceedings thereunder, the section-by-section cross-comparison utilized in the equal protection analysis is of little assistance. The equal protection clause aside, however, it is still clear that persons subjected to c. 123A proceedings are entitled to procedural due process. *Commonwealth* v. *Gomes,* 355 Mass. 479, 484 (1969). *Commonwealth* v. *Lamb,* 365 Mass. 265, 270 (1974). "Once it is determined that due process applies, the question remains what process is due. It has been said so often . . . as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). We think that "the particular situation" of adjudicating a person an SDP and committing him to the treatment center demands that the Commonwealth prove beyond a reasonable doubt that the person is sexually dangerous.

In *Speiser* v. *Randall,* 357 U. S. 513, 525-526 (1958), the Supreme Court observed in dictim: "There is always in litigation a margin of error . . .. Where one party has at stake an interest of transcending value — as a criminal defendant his liberty — this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt." In *In re Winship,* 397 U. S. 358, 363 (1970), the court said: "The requirement of proof beyond a reason-

able doubt has . . . [a] vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." In light of such considerations, the *Winship* court explicitly held that due process required as a prerequisite to a criminal conviction that the government prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *Id.* at 364. More pertinent to our present inquiry, the *Winship* court also extended this proof requirement to the adjudicatory stage of a juvenile delinquency proceeding, notwithstanding the State's argument that juvenile proceedings were civil and nonpunitive in nature. *Id.* at 365-366, 368. See *Mullaney* v. *Wilbur,* 421 U. S. 684, 696-704 (1975).

We have consistently labeled c. 123A proceedings civil and nonpunitive. See, for example, *Commonwealth* v. *Hogan,* 341 Mass. 372 (1960); *LaMorre* v. *Superintendent of Bridgewater State Hosp.* 347 Mass. 534, 538 (1964); *Commonwealth* v. *Major,* 354 Mass. 666, 668 (1968), cert. den. 393 U. S. 1109 (1969); *Commonwealth* v. *Pimental,* 362 Mass. 854 (1972); *Commonwealth* v. *Lamb,* 365 Mass. 265, 270 (1974). We adhere to that position. Nevertheless, the affixing of a "civil" label to SDP proceedings does not answer the question of what process is due, just as the affixing of a "civil" label did not answer that question in the juvenile delinquency context.

In commenting on a proceeding under a Pennsylvania statute which is generally similar to c. 123A, the United States Court of Appeals for the Third Circuit stated: "It is a separate criminal proceeding which may be invoked after conviction of one of the specified crimes. Petitioner therefore was entitled to a full judicial hearing before the magnified sentence was imposed. At such a hearing the requirements of due process cannot be satisfied by partial or niggardly procedural protections. A defendant in such

a proceeding is entitled to the full panoply of the relevant protections which due process guarantees in state criminal proceedings. He must be afforded all those safeguards which are fundamental rights and essential to a fair trial . . .." *United States ex rel. Gerchman* v. *Maroney,* 355 F. 2d 302, 312 (3d Cir. 1966). In commenting on a Colorado statute of a similar nature, the United States Supreme Court quoted the above statement and said that it agreed with it. *Specht* v. *Patterson,* 386 U. S. 605, 608-609, 610 (1967).

As of the date of our decision, the Supreme Court has not ruled on the precise question of the degree of the burden of proof required in cases involving involuntary commitment of SDPs or mentally ill persons. See *Murel* v. *Baltimore City Criminal Court,* 407 U. S. 355, 356-358 (1972). We nevertheless find that the implications of the foregoing cases, particularly *Winship* construed in light of *Specht,* lead inexorably to the conclusion that a person who stands to lose his freedom and to be labeled sexually dangerous is entitled to the benefit of the same stringent standard of proof as that required in criminal cases.

The late Mr. Justice Harlan expressed well the "comparative social disutility," *In re Winship,* 397 U. S. 358, 371 (1970) (Harlan, J., concurring), of erroneous fact finding in various kinds of litigation: "In a civil suit between two private parties for money damages . . . we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. A preponderance of the evidence standard therefore seems peculiarly appropriate . . .. In a criminal case, on the other hand, we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty. . . . In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to

convict an innocent man than to let a guilty man go free." *Id.* at 371-372 (Harlan, J., concurring). Applying this "comparative social disutility" analysis to juvenile delinquency proceedings, Mr. Justice Harlan concluded that while the consequences of erroneous factual determinations in such proceedings were not identical to those in a criminal case, the differences did not warrant a distinction in the standard of proof because a delinquency adjudication and a criminal conviction each stigmatize the accused and expose him to a loss of liberty. *Id.* at 373-374.

In discussing the California statute providing for commitment of mentally disoriented sex offenders (MDSOs), the California Supreme Court pointed out that (1) a person adjudicated an MDSO faces a loss of liberty potentially more grievous than that facing a juvenile adjudicated a delinquent, since the MDSO commitment could last for the rest of the MDSO's life, and (2) a person adjudicated an MDSO receives a stigma at least as great as that flowing from a criminal conviction or an adjudication of juvenile delinquency. *People v. Burnick,* 14 Cal. 3d 306, 320-321 (1975). The court therefore concluded that the standard of proof in MDSO proceedings must be as high as it is in juvenile delinquency proceedings, that is, proof beyond a reasonable doubt. *Id.* at 28. We agree with that reasoning and believe it applies to SDP proceedings. In short, we do not think that the Commonwealth can be permitted to label a person sexually dangerous and deprive him of his liberty for an indeterminate period which may extend over the rest of his natural life merely on proof that it is more likely than not that the person is sexually dangerous. We therefore hold that the Commonwealth must prove its case beyond a reasonable doubt in order to obtain an order granting a petition that a person be adjudicated an SDP and committed as such or that he continue to be held in custody whenever his petition for release is heard. In so holding, we follow the lead of a number of other

courts who have adopted a standard of proof higher than a mere preponderance of the evidence in various kinds of involuntary civil commitments. See, for example, *In re Ballay*, 482 F. 2d 648, 653-669 (D. C. Cir. 1973) (proof beyond a reasonable doubt); *In re Hodges*, 325 Atl. 2d 605, 607 (D. C. App. 1974) (proof beyond a reasonable doubt); *Lessard* v. *Schmidt*, 349 F. Supp. 1078, 1095 (E. D. Wis. 1972) (proof beyond a reasonable doubt), vacated and remanded on other grounds, 414 U. S. 473 (1974); *People* v. *Burnick*, 14 Cal. 3d 306, 308 (1975) (proof beyond a reasonable doubt); *In re Pickles' Petition*, 170 So. 2d 603, 614 (Fla. Ct. App. 1965) (proof beyond a reasonable doubt); *People* v. *Sansone*, 18 Ill. App. 3d 315, 325-326 (1974) (proof by clear and convincing evidence); *Denton* v. *Commonwealth*, 383 S. W. 2d 681, 683 (Ky. 1964) (proof beyond a reasonable doubt); *In re Levias*, 83 Wash. 2d 253, 254-256 (1973) (proof by clear, cogent, and convincing evidence; said by the court to be the civil counterpart of the criminal reasonable doubt standard). See also *Murel* v. *Baltimore City Criminal Court*, 407 U. S. 355, 359-365 (1972) (Douglas, J., dissenting) (proof beyond a reasonable doubt; majority did not reach the merits). For scholarly commentary urging that the standard of proof in commitment proceedings be higher than a mere preponderance of the evidence, see, for example, Note, Out of Tune with the Times: The Massachusetts SDP Statute, 45 B. U. L. Rev. 391, 404-405 (1965) (proof beyond a reasonable doubt); Comment, Commitment and Release Standards and Procedures: Uniform Treatment for the Mentally Ill, 41 U. of Chicago L. Rev. 825, 829 (1974) (proof beyond a reasonable doubt); Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv. L. Rev. 1288, 1291 (1966) (proof by clear and convincing evidence); Developments in the Law — Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1295-1303 (1974) (seems to urge proof beyond a reasonable doubt in at least some types of commitments). Compare with the foregoing

cases and articles *State* v. *Carter*, 64 N. J. 382, 400, 407-408 (1974) (dealing with burden of proof concerning a committed person's eligibility for "conditional release" where he is not fully "restored to reason").

III. CONCLUSION.

We have held above that the petitioner is at present lawfully in custody. Accordingly, the petition for a writ of habeas corpus must be, and hereby is, denied. Hereafter, however, the petitioner will be entitled to periodic review of his status under G. L. c. 123A, § 9, and in accordance with this opinion.

*So ordered.*